Docket No. CP98-150-006, et al.                                                    - 36 -

Account 858 costs associated with the Millennium lease until Columbia submits a section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

### 3.    Gas Quality Specifications

119.    On June 5, 2006, Consolidated Edison and Orange and Rockland jointly protested Columbia's tariff filings in Docket Nos. RP06-231-002 and RP06-365-000 and requested that we convene a consolidated technical conference in the dockets involved in Columbia's tariff filings and the dockets involved in Millennium's and Columbia's proceedings to discuss Columbia's proposed gas quality specifications.

120.    Columbia's proposed gas quality specifications are part of an ongoing section 4 proceeding in Docket Nos. RP06-231-002 and RP06-365-000 in which we held a technical conference on July 25, 2006.  Since a technical conference on the same issue is not necessary in Millennium's and Columbia's proceedings, we will deny the requests for a consolidated technical conference.

### E.    Other Issues Relating to Millennium

### 1.    Motion to Vacate

121.    In its original proposals filed in 1997 and 2000, Millennium proposed to construct facilities across the Hudson River through Westchester County to Mount Vernon.  The construction of facilities across the Hudson River through portions of Westchester County involved New York's coastal zone.  Thus, in approving its proposals in the 2002 *Millennium* Order, we required Millennium to obtain a CZMA determination from NYSDOS before commencing the construction of those facilities to Mount Vernon. NYSDOS found that Millennium's proposals were inconsistent with New York's Coastal Management Program.  Millennium appealed the NYSDOS finding.

122.    In its applications in Docket Nos. CP98-150-006 and CP98-150-007, Millennium proposed to amend the 2002 *Millennium* Order to phase construction of the project.  In Phase I, Millennium proposed to acquire, construct, and operate facilities from the North Greenwood station east to the Ramapo station, among other things.  Millennium requested that the Commission defer consideration of the portion of the 2002 *Millennium* Order that authorized the crossing of the Hudson River to Mount Vernon until Phase II, because its appeal of NYSDOS' decision was pending.  Millennium also requested that the Commission defer consideration of the Lake Erie to North Greenwood portion of pipeline, because that segment was no longer needed due to changes in the market.

Docket No. CP98-150-006, et al.                                    - 37 -

123.    Subsequent to its filings in Docket Nos. CP98-150-006 and CP98-150-007, the *Gutierrez* decision upheld NYSDOS' finding that the proposed construction of facilities across the Hudson River through portions of Westchester County were inconsistent with New York's Coastal Management Program. In Docket No. CP98-150-008, Millennium filed a motion to vacate the portion of the 2002 Millennium Order that authorized construction from Lake Erie to North Greenwood and from Ramapo to Mount Vernon, *i.e.*, the Phase II facilities. In support of its motion, Millennium states that it no longer seeks authority to construct the Phase II facilities because it does not intend to request review of the District Court's decision in *Gutierrez*, which precludes the construction of facilities across the Hudson River through Westchester County.

124.    Croton-on-Hudson and Cortlandt protested Millennium's applications in Docket Nos. CP98-150-006 and CP98-150-007, objecting to the proposed phasing of the 2002 *Millennium* Order. The County of Westchester, New York (Westchester) filed comments also objecting to the proposed phasing. In their answers to the motion to vacate, Cortlandt and Westchester state that they support the motion. Croton-on-Hudson states that it will not oppose Millennium's motion as long as Millennium does not have authority to construct facilities on any route that does not comply with the CZMA, that the proposed facilities approved here comply with all applicable statutory and regulatory requirements, that no other phases of the Millennium project are approved here, and that additional proposals for future phases must be the subject of a new application by Millennium.

125.    In its motion to vacate, Millennium states that it does not intend to construct facilities from Lake Erie to North Greenwood or from the Ramapo station to Mount Vernon. No party opposes Millennium's motion. Thus, we find that it is in the public interest to vacate the portions of the 2002 *Millennium* Order that relate to these facilities and to vacate the corresponding certificate and environmental conditions.

126.    In regard to Croton-on-Hudson's concerns, the amended certificate approved herein authorizes Millennium to construct facilities from Corning to the Ramapo station only. The certificate is conditioned upon Millennium's compliance with the applicable NGA and environmental regulations and does not authorize Millennium to construct facilities on any route that raises CZMA concerns. If Millennium wishes to construct any facilities other than those authorized in this order, it must seek additional authorization from the Commission.

## 2.    Status as a Natural Gas Company

127.    Millennium requests that the Commission make a finding that it will not be considered a "natural gas company" subject to the Commission's jurisdiction until it

Docket No. CP98-150-006, et al.                                          - 38 -

commences the transportation of natural gas in interstate commerce. Millennium raises this issue because Columbia is requesting a limited-term certificate to temporarily operate segments of Millennium's pipeline to continue service to Columbia's existing Line A-5 customers, while other segments of Millennium's pipeline are under construction.

128.    Section 2(6) of the NGA defines a "natural gas company," in part, as a "person engaged in the transportation of natural gas in interstate commerce . . . ." Section 7(c)(1) of the NGA provides, in part, that:

> No natural gas company or person which will be a natural gas company
> upon completion of any proposed construction or extension, shall engage in
> the transportation or sale of natural gas, subject to the jurisdiction of the
> Commission . . . unless there is in force with respect to such natural gas
> company a certificate of public convenience and necessity . . . .

129.    Section 2(6) implies that a person must be engaged in the transportation of natural gas in interstate commerce to be a natural gas company. Section 7(c)(1) implies that to be a new natural gas company, a person must complete any proposed construction. At the time Columbia operates segments of Millennium's pipeline under the limited-term certificate, Millennium will not have engaged in any transportation in interstate commerce, nor will it have completed the construction of its facilities. Thus, we find that Millennium will not be a natural gas company when Columbia operates segments of Millennium's system under Columbia's limited-term certificate.

#### 3.    Accounting

##### a.    Book Depreciation Rate

130.    For financial accounting purposes, Millennium proposes to use a straight-line depreciation rate of 3.33 percent per year over a 30-year period for the proposed transportation facilities. A straight-line method to record book depreciation is acceptable because it is a systematic and rational method consistent with the Commission's Uniform System of Accounts. Thus, we will approve a 3.33 percent depreciation rate for Millennium.

##### b.    Regulatory Assets

131.    Millennium proposes to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates by debiting Account 182.3, Other Regulatory Assets, and by crediting Account 407.4, Regulatory Credits. Millennium also proposes to extinguish or amortize the regulatory

Docket No. CP98-150-006, et al.                                                    - 39 -

asset by crediting Account 182.3 and debiting Account 407.3, Regulatory Debits, as the amounts are recovered in rates. Millennium contends that the depreciation component of the proposed levelized negotiated rates will, by the end of the contract term, equal the accumulated book depreciation. Millennium also contends that it is assured of recovery of the regulatory asset, because of binding commitments in executed precedent agreements with its shippers.

132.    Under our Uniform System of Accounts, it is appropriate to record a regulatory asset for costs that would otherwise be chargeable to expense only when it is probable that the costs will be recovered in future rates.[62] For rate levelization proposals, we have previously concluded that the Order No. 552 probability test is met to the extent that a pipeline's capacity is subscribed when the facilities are authorized.[63] Thus, we allow regulatory assets, or liabilities, to be recorded for the differences between book depreciation expense and the amount of depreciation included in rates to the extent the pipeline's capacity is subscribed.

133.    Millennium indicates that it currently has approximately 80 percent of its total firm capacity subscribed under precedent agreements at negotiated rates. To the extent Millennium has executed contracts for its usable capacity over the respective terms of the shippers' agreements, we conclude that it would be appropriate for Millennium to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates. Nevertheless, we will condition our approval of Millennium's proposed accounting treatment: (1) on Millennium and its shippers executing and filing service agreements that are consistent with their precedent agreements and which provide assurance of recovery of the regulatory asset and (2) on future Commission acceptance of the negotiated rate filings.[64] Further, we will not allow

---

[62] The term "probable," as used in the definition of regulatory assets, refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain or proved. *Revisions to Uniform System of Accounts to Account for Allowances under the Clean Air Amendments of 1990 and Regulatory-Created Assets and Liabilities and to Form Nos. 1, 1-F, 2, and 2-A*, Order No. 552, FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 30,967 (1993).

[63] *E.g., TransColorado Gas Transmission Co.*, 67 FERC ¶ 61,301 at 62,064, *order on reh'g*, 69 FERC ¶ 61,066 (1994); *Mojave Pipeline Co.*, 69 FERC ¶ 61,244 (1994), *order issuing certificate and denying reh'g*, 72 FERC ¶ 61,167 (1995), *order vacating prior orders and dismissing motions*, 75 FERC ¶ 61,108 (1996).

[64] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 28 (2006).

Docket No. CP98-150-006, et al.                                                      - 40 -

Millennium to shift any unrecovered costs associated with the negotiated rate agreement to any of its other customers.[65]

134.  Our acceptance is subject to Millennium's continuing obligation to meet the criteria for recognition of its regulatory asset.  Should circumstances change so that Millennium is no longer entitled to recognize a regulatory asset, Millennium must promptly notify the Commission in an appropriate filing that would propose to remove the regulatory asset from its accounts.[66]

### 4.    Tariff

135.  We find that Millennium's *pro forma* tariff generally complies with Commission policy and precedent, except for certain provisions noted below.  In accordance with the discussion below, we will require Millennium to file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities.

### a.    Scheduling

### (1)    Proposals

136.  Section 7.1 describes the order of scheduling when nominations exceed available capacity.[67]  According to section 7.1, Millennium proposes to schedule capacity first at delivery points, followed by internal constraint points, and finally receipt points.  At each location, Millennium will first schedule nominations for firm primary capacity, followed by nominations for firm secondary capacity.  Millennium will schedule nominations for firm secondary capacity within a shipper's primary path ahead of nominations for firm secondary capacity outside the primary path.[68]  Within each group of secondary firm nominations (within-the-path versus outside-the-path), nominations at the maximum tariff rate will be allocated capacity *pro rata* based on nominated quantities, followed by

---

[65] *Id.* at P 29.

[66] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 30.

[67] Unless otherwise indicated, references to Millennium's tariff are to sections in the GT&C.

[68] Millennium defines the primary path as capacity physically located between the primary receipt and delivery points designated by a shipper, taking into consideration the flow direction from receipt point to delivery point.

Docket No. CP98-150-006, et al.                                                    - 41 -

nominations at a contract rate with the highest net present value, until all secondary firm nominations are scheduled.

137.    After firm nominations are scheduled, Millennium will schedule Rate Schedule IT-1 nominations together with Rate Schedule FT-1 overrun nominations, with priority given to confirmed flowing nominations on a *pro rata* basis, followed by other such nominations in the order in which they were received (with nominations submitted the same day receiving equal allocations).

138.    Finally, where applicable, Millennium will schedule Rate Schedule IPP (Interruptible Paper Pools) nominations, followed by Rate Schedule PALS (Parking and Lending Service) nominations.[69] Specifically, paragraph (e) of section 7.4 provides that if there is insufficient capacity to satisfy all IPP and PALS nominations, the nominations will be rejected and the holders of rejected nominations for IPP and PALS service will be notified so that they can arrange for or implement a transfer between pools under Rate Schedule IPP, arrange for an inventory transfer under section 18 (Transfers of Imbalance Netting and Trading), arrange for a predetermined allocation method, re-nominate directly from a receipt point and not from the IPP pool, or make other arrangements agreed to by Millennium.

## (2)    Commission Holding

139.    In *Columbia Gas Transmission Corporation (Columbia)*,[70] we rejected a proposal to allocate firm secondary capacity based on the present value of the rate paid, finding that it favored shippers with long term contracts. We held that the length of a contract should not determine how much a shipper values secondary capacity, since one has nothing to do with the other. Consistent with our decision in *Columbia*, we will reject Millennium's proposal to allocate secondary capacity under Rate Schedule FT-1 based on the net present value of the rate paid, as described in paragraphs (b) and (c) of sections 7.2, 7.3, and 7.4. Rather, we will require Millennium to allocate nominations for firm secondary capacity *pro rata* based on each shipper's contract demand. This allocation method is appropriate because: (1) firm shippers are entitled to use available secondary capacity up to their contract demand within the zone for which they are paying

---

[69] PALS service can only be nominated at receipt and delivery points and IPP service can only be nominated at receipt points.

[70] 100 FERC ¶ 61,084 at P 101 (2002); *order on reh'g, clarification, and compliance filing*, 104 FERC ¶ 61,168 (2003).

Docket No. CP98-150-006, et al.                                                                 - 42 -

and (2) firm shippers are able to access secondary points on a nondiscriminatory basis, unlike the net present value method.

140.   Moreover, we will require Millennium to explain its proposal in paragraph (d) of sections 7.2, 7.3 and 7.4, to allocate IT-1 and FT-1 overrun quantities based on a queue that gives scheduling priority to nominations involving flowing interruptible and overrun volumes over nominations for volumes whose flow has not yet begun. Millennium should also include in its explanation the reason why it believes such an allocation method is more appropriate than allocating such volumes based on price or *pro rata* based on nominated quantity.

141.   We also note that Millennium has not described the method for allocating receipt point capacity among IPP and PALS nominations under section 7.4(e). We will require Millennium to revise section 7.4(e) to include that description. We will also require Millennium to revise section 7.4(e) to detail the procedures and timelines under which it will implement various alternative scheduling arrangements for rejected PALS and IPP nominations.

142.   Finally, although the tariff refers to backhaul retainage on Sheet No. 6 and defines "backhaul" in section 1.1, it is not clear what scheduling and curtailment priorities have been assigned to backhaul transactions. Thus, we will require Millennium to add tariff language addressing the scheduling and curtailment priorities of backhaul transactions.

### b.      Interruptions of Service

### (1)      Proposals

143.   Section 16 describes the circumstances and rules under which Millennium may decrease, suspend, or discontinue the receipt and delivery of gas. Such interruptions may occur due to *force majeure* or other unforeseen conditions; operating conditions such as (but not limited to) performance of routine non-critical maintenance, repairs, tests and modification of the system; for protection of the integrity and performance capability of the system; and to make capacity being utilized by interruptible service available for firm service. Millennium will issue a notice to shippers 72 hours in advance of an interruption due to routine maintenance specifying the date and time for compliance and the lowered flow quantity. Millennium will limit a notice of interruption to shippers only on the affected segment of the system. A shipper failing to comply with the notice will be subject to penalties, as described later in this order.

144.   Section 16.4 describes the order in which Millennium will interrupt the receipt, delivery, or transportation of scheduled and flowing volumes on constrained portions of

Docket No. CP98-150-006, et al.                                               - 43 -

its system. Specifically, Millennium proposes to curtail PALS volumes on a *pro rata* basis according to scheduled parking or lending quantity followed by IT-1 volumes together with FT-1 overrun volumes, FT-1 volumes at secondary receipt or delivery points outside shippers' primary paths, FT-1 volumes at secondary receipt or delivery points within shippers' primary paths, FT-1 volumes at primary receipt points, and FT-1 volumes at primary delivery points.

### (2)    Commission Holding

145.    We will require Millennium to revise section 16.4 so that within any constrained portion of its system, all scheduled firm nominations will be curtailed at the same priority, *pro rata* based on scheduled daily quantity. Our policy provides that "once secondary firm capacity is scheduled, primary firm capacity does not have a higher priority for the purposes of bumping or curtailing firm service."[71] In addition, Millennium should explain in detail why it proposes to curtail firm capacity at receipt points ahead of firm capacity at delivery points. Finally, Millennium should add language to section 16.4 describing the curtailment priority of IPP quantities and the method for allocating capacity among such quantities.

### c.    Penalties

146.    In section 4(e) of Rate Schedule IT-1, Millennium proposes what appears to be a $5.00 per Dth penalty on unauthorized quantities taken by a shipper under Rate Schedule IT-1 despite the shipper not having an IT-1 service agreement. The language describing this penalty is confusing and would appear to impermissibly duplicate penalties under the shipper's applicable rate schedule or applicable penalties under Millennium's GT&C. We will require Millennium to explain this provision and make clarifying revisions or remove it from the tariff.

147.    Section 19.6 describes a mechanism by which Millennium will credit penalties, net of costs, to non-penalized FT-1 and IT-1 shippers, excluding replacement shippers using released capacity. It is the Commission's policy that penalty revenue credits should be distributed to all the pipeline's customers, because penalties are imposed on all interruptible shippers and all non-offending interruptible shippers should be credited with a portion of these revenues.[72] Interruptible rates also include a representative portion of

---

[71] *Algonquin Gas Transmission Co.*, 104 FERC ¶ 61,118 at P 34 (2003).

[72] Section 284.12(b)(2)(v) requires that pipelines credit penalty revenues to "shippers."

Docket No. CP98-150-006, et al.                                    - 44 -

all costs, including fixed costs, of operating the pipeline and all interruptible shippers are entitled to share in the proceeds of credits.[73] Moreover, as explained in Order No. 637, crediting penalty revenues to non-offending shippers provides a positive incentive for shippers to stay in balance in order to help protect the operational integrity of the pipeline. Thus, any replacement shipper under a permanent release of capacity is entitled to be included in the crediting mechanism. We will require Millennium to apply the crediting mechanism to all non-penalized shippers on its system including PALS shippers, IPP shippers, and replacement shippers, not just the FT-1 and IT-1 shippers as proposed.

148.    In addition, we will require Millennium to add a paragraph to section 19.6 stating that it will file a report within 60 days of the close of the contract year (for calculating penalties) showing how it calculated and apportioned the penalty revenues, the costs netted against the penalty revenues, and the resulting penalty revenue credits for each month of the contract year (November 1 to October 31).

149.    In paragraph (b) of section 9.7, Millennium proposes to sell any remaining over delivery imbalance to the shipper whose agreement has terminated at 150 percent of a specific spot market price, plus transportation costs, and to keep all amounts as a reimbursement fee. We will require Millennium to include as penalty amounts in its crediting mechanism any proceeds, net of Millennium's actual costs, from over delivery imbalance sales which exceed 100 percent of the spot market price. Also, in paragraph (c) of section 9.7, Millennium proposes to forward to a shipper 80 percent of the proceeds of the sale of any under delivery imbalance left on the system and confiscated by Millennium at the termination of the agreement, keeping the remaining 20 percent as a reimbursement fee. We will require Millennium to include as penalty revenues in its crediting mechanism any proceeds, net of Millennium's actual costs, from under delivery imbalance sales which exceed amounts forwarded to the shipper whose gas was confiscated.

150.    Finally, we will require Millennium to add a provision to section 19.7 stating that within two weeks of a critical day event, it will post information on its electronic bulletin board describing the events leading up to the declaration of the critical day.

---

[73] *Transcontinental Gas Pipe Line Corp.*, 96 FERC ¶ 61,352 at 62,317 (2001).

Docket No. CP98-150-006, et al.                                                    - 45 -

### d.    Creditworthiness

151.    Section 3.9(c) requires insolvent or uncreditworthy FT-1 shippers to provide collateral assurance equal to three months of demand charges in order to receive or continue to receive service. However, Millennium appears not to have provided collateral requirements for shippers using interruptible services. We will direct Millennium to explain this omission or revise section 3.9.

152.    Section 3.9(c) also provides that any deposit held by Millennium will accrue simple interest at the Federal Funds Rate. Our Creditworthiness Policy Statement provides that if a pipeline holds the collateral, the applicable interest rate will be at least the same rate that the pipeline earns.[74] We will require Millennium to explain how this provision of section 3.9(c) is consistent with the Creditworthiness Policy Statement and to make any necessary revisions.

153.    Further, in section 3.9(c), Millennium proposes the right to seek additional security to cover the value of any existing imbalance or estimated future monthly imbalance owed by a non-creditworthy shipper. For a new shipper, the collateral would be based on 10 percent of the shipper's estimated monthly usage. For an existing shipper, the collateral would be based on the largest monthly imbalance the shipper owed to Millennium during the most recent 12 months of service.

154.    In *Gulf South Pipeline Company, LP (Gulf South)*,[75] we approved a provision similar to that in section 3.9(c) for existing shippers based on the largest monthly imbalance over the preceding 12 months. We also found that for new shippers, seven months was an adequate period to establish an imbalance history upon which a collateral requirement could be based. Thus, consistent with *Gulf South*, the imbalance collateral requirement for new shippers during the first seven months of service should be based on 10 percent of the shipper's estimated monthly usage, after which the shipper's collateral requirement should be based upon the highest monthly imbalance over the most recent period of service not to exceed 12 months. With the revision described above, we will approve Millennium's right to seek additional security for the value of imbalances as provided in section 3.9(c).

---

[74] *Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines*, 111 FERC ¶ 61,412 (2005) (Creditworthiness Policy Statement).

[75] 111 FERC ¶ 61,110 (2005).

Docket No. CP98-150-006, et al.                                    - 46 -

155.    Sections 3.10(a) and (b) of the tariff appear to address Millennium's right to suspend service to a shipper that has lost its creditworthiness status, although the word "suspension" is not used. Paragraph (b) provides that regardless of whether the shipper has lost its creditworthiness status, is insolvent, or does not desire to continue service, the shipper will continue to be liable for all charges due Millennium. Under the Creditworthiness Policy Statement, a pipeline is not permitted to impose reservation charges during a period of suspension, nor is the suspended shipper permitted to release its capacity.[76] Because sections 3.10(a) and (b) do not expressly state whether the shipper's service is suspended in such circumstances, we will require Millennium to explain whether this is the case and to clarify its tariff consistent with the Creditworthiness Policy Statement.

156.    Section 3.10(c) addresses the circumstances under which Millennium may terminate a service agreement, if a shipper fails to pay any outstanding balance or provide adequate credit assurance within a 30-day notice period. Millennium should revise this section to include a requirement that a pipeline seeking to terminate a release of capacity to a replacement shipper on account of the termination of a releasing shipper's contract must provide the replacement shipper with the opportunity to continue receiving service if the replacement shipper agrees to pay, for the remaining term of the replacement shipper's contract, the lesser of: (1) the releasing shipper's contract rate; (2) the maximum tariff rate applicable to the releasing shipper's capacity; or (3) some other rate that is acceptable to the pipeline.[77] Millennium should also revise section 14.12, which addresses termination of a releasing shipper's contract, to be consistent with this requirement.

>           e.        **Discounting**

157.    Under section 20.2, Millennium proposes that it "may agree to a discount which provides for increasing (or decreasing) a discounted rate for service under one rate schedule to make up for a decrease (or increase) in the maximum rate for a separate service provided under another rate schedule." This provision, in effect, would appear to establish a maximum recourse rate that would be applicable to a combination of services. We will require Millennium to justify this provision under our policy or remove it from the tariff.

---

[76] Creditworthiness Policy Statement at P 24.

[77] *Id.* at P 32.

Docket No. CP98-150-006, et al.                                                    - 47 -

### f.    Auctions of Available Firm Service

158.    Under section 4, Millennium provides both contractual and regulatory rights of first refusal to shippers receiving service under an agreement with a term of 12 or more consecutive months at the recourse rate. We will require Millennium to revise section 4 to apply the regulatory rights of first refusal to multi-year seasonal agreements at the maximum recourse rate. Millennium may also apply its contractual rights of first refusal provisions to such multi-year seasonal agreements.[78]

### g.    Termination of Service Agreement

159.    Section 154.602 of the regulations requires a natural gas company to notify the Commission at least 30 days prior to terminating a shipper's contract. Sections 10.4 (Suspension of Termination for Nonpayment) and 14.12 (Termination) are not consistent with this requirement. Thus, we will require Millennium to revise these sections.

### h.    Non-Conforming Agreements

160.    Section 5.1 requires shippers to enter into service agreements "under [the] applicable standard Form of Service Agreement or Assignment Agreement," but also provides that a "Service Agreement that was in effect on the effective date of this Tariff shall remain in effect until it is replaced . . . or expires by its own terms, and shall be considered as an executed Service Agreement to the extent that its provisions are not superseded by or in conflict with . . . this Tariff." We will advise Millennium that this language does not preclude its compliance with section 154.112(b) of the regulations, requiring that Part 284 contracts that deviate in any material aspect from the form of service agreement must be filed with the Commission and referenced in the tariff.

---

[78] In reviewing Millennium's tariff, we also found several minor errors that should be corrected. Specifically, Millennium should substitute the word "Millennium" for the words "El Paso" in section 15.3(b)(iii); update its tariff to reflect the version of the North American Energy Standards Board (NAESB) Standards, including annual plan items and recommendations, in effect at the time it files actual tariff sheets; substitute "NAESB" for all references to "GISB;" and, in section 3.9(k), move the comma from after the first occurrence of the word "Days" to before the first occurrence of the word "within" to conform to NAESB Standard 0.3.9.

Docket No. CP98-150-006, et al.                                        - 48 -

### i.  **Fuel Retainage**

161.   In section 35, Millennium proposes tariff language which appears intended to implement an annual fuel tracking mechanism similar to the currently effective provisions in Columbia's tariff.  Millennium's proposed tariff provides for an annual filing to adjust the retainage quantities, but does not specify that the annual filing will account for over- and under-recovered company use and LAUF.  Further, the proposed tariff language lacks a detailed description of the mechanism by which it will separately calculate current retainage and over- and under-recovered retainage.  Thus, we will direct Millennium to revise its tariff to incorporate clarifying language as discussed above.

### F.   **Requests for rehearing and clarification of EPI's Preliminary Determination**

162.   EPI, Hess Corporation (Hess),[79] and the New York PSC filed requests for rehearing and clarification of EPI's preliminary determination.

### 1.  **Acquisition Adjustment**

#### a.  **Request for Rehearing**

163.   The preliminary determination held that EPI could not include in its rate base the proposed $36 million acquisition adjustment reflecting a portion of the amount paid in excess of net book value when NFG acquired Empire in 2003.  In making this holding, the preliminary determination found that EPI did not meet the two-prong test found in *Longhorn Partners Pipeline, L.P. (Longhorn)*,[80] because EPI did not show that it was placing utility assets in jurisdictional service for the first time and because it did not show that the write-up would confer substantial benefits on ratepayers.  On rehearing, EPI asserts that it meets the requirements of an exception to the original cost policy established in *Longhorn*, because:  (1) it will be subject to the Commission's jurisdiction for the first time and (2) the benefits to customers are substantial and can be quantified.

164.   As to the first prong, EPI asserts that the Commission erred in finding that its facilities were devoted to NGA jurisdiction simply because Empire accepted a blanket

---

[79] Hess was formerly known as Amerada Hess Corporation.

[80] 73 FERC ¶ 61,355 (1995).

Docket No. CP98-150-006, et al.                                        - 49 -

certificate under section 284.224 of the regulations.[81] EPI claims that for assets to be subject to Commission jurisdiction, they must be subject to the rate and certificate jurisdiction, as well as the Commission's open access requirements. EPI points out that section 284.224 provides that it does not "subject the certificate holder to the [NGA] jurisdiction [of] the Commission except to the extent necessary to enforce the terms and conditions of the certificate." Thus, EPI asserts that Empire is coming under the Commission's jurisdiction for the first time. Further, EPI contends that the Commission erred in relying on the *Enbridge Pipelines (Enbridge)* case,[82] asserting that *Enbridge* did not address the issue of placing assets into jurisdictional service for the first time, because Enbridge did not raise the issue.[83]

165.   As to the second prong, EPI contends that it demonstrated that the acquisition of the Empire system and construction of the connector project will confer substantial benefits on pre-existing shippers by enhancing the reliability and flexibility of the system and by enabling the shippers to use their capacity to deliver gas to Millennium and downstream markets. Specifically, EPI asserts that: (1) it took into account expansion capacity held by KeySpan and future expansion shippers, since more gas can flow to Corning on a secondary basis over and above the full contract quantities of KeySpan and other expansion shippers; (2) its calculations are not speculative or excessive, since it described in detail how it determined the annual benefits for existing shippers; and (3) as a result of NFG's acquisition of Empire, NFG's new management began development of the connector project and that the benefits to the existing shippers stem from the acquisition.

166.   EPI contends that the integration of the proposed expansion project with Empire's existing facilities will enhance system reliability for existing shippers. Further, EPI asserts that existing shippers will now have the ability to deliver gas to Millennium and to downstream markets in New York City and Long Island. EPI calculates $5.3 million in annual benefits for existing shippers who use the Millennium point on a secondary basis,

---

[81] Empire currently transports gas for two interstate pipelines under a blanket certificate issued under section 284.224.

[82] EPI's preliminary determination at P 59, *citing Enbridge*, 100 FERC ¶ 61,260 at P 52 (2002), *order on reh'g,* 102 FERC ¶ 61,310 (2003).

[83] *Citing Enbridge,* 102 FERC ¶ 61,310 at P 17 (stating that "KPC has not previously argued that it should be given rate base treatment for its acquisition premium because it was putting facilities in FERC jurisdictional service for the first time either at the hearing or on exceptions").

Docket No. CP98-150-006, et al.                                                    - 50 -

or release their capacity to other shippers that use that point. EPI asserts that it calculated the benefits by: (1) determining the amount of unused firm capacity under existing operations, based on an average of the system usage for the past two years; (2) estimating the extent to which that capacity could be used for delivery of gas into Millennium; and (3) estimating the value of the resulting capacity. According to EPI's calculations, it determined that the value of the secondary capacity would be $.05 per Dth in the summer and $.30 per Dth in the winter.

### b.    Commission Holding

167.    Our policy is to permit a pipeline to include no more than the facilities' depreciated original cost in rate base. We make exceptions only when a pipeline can show that its acquisition of existing facilities at more than their net book value will result in substantial benefits to ratepayers under the two-prong test set forth in *Longhorn*. First, the acquiring pipeline must show that it is converting utility assets to a new public use, or that it is placing utility assets in jurisdictional service for the first time. Second, the acquiring pipeline must show by clear and convincing evidence that the acquisition provides substantial, quantifiable benefits to ratepayers.

168.    EPI's contention that it meets the first prong of *Longhorn* because it is placing utility assets into jurisdictional service for the first time is at odds with the facts in this proceeding. Empire has been subject to Commission authority since it received a blanket certificate issued under section 284.224 of the regulations to transport gas for two interstate pipelines.[84] Empire also received Commission authorization to construct and operate its natural gas facilities between the United States and Canada.[85] Acknowledging these facts, EPI asserts that in order for facilities to be subject to the Commission's jurisdiction under *Longhorn*, they must be subject to the rate and certificate jurisdiction as well as our open access requirements. However, EPI offers no support for its position and we conclude that it is not required by the wording of *Longhorn* which states, "[f]irst, [a pipeline] must show that it is either converting utility assets to a new public use, or it must show that it is placing utility assets in FERC-jurisdictional service for the first time."[86] We find the fact that Empire held a limited jurisdictional certificate under which

---

[84] *National Fuel Gas Supply Corp.*, 70 FERC ¶ 61,162 (1995).

[85] *Empire State Pipeline* 56 FERC ¶ 61,050 (1991), *order granting rehearing in part and denying rehearing in part and denying a motion to consolidate*, 61 FERC ¶ 61,091 (1992), *order on motion for clarification*, 64 FERC ¶ 61,035 (1993).

[86] *Longhorn*, 73 FERC ¶ 61,355 at 61,122.

Docket No. CP98-150-006, et al.                                          - 51 -

it rendered interstate transportation service sufficient to preclude a finding that Empire is coming under our jurisdiction for the first time under *Longhorn*.

169.     In reviewing whether to allow the inclusion of amounts in excess of depreciated original cost, we have emphasized the need to protect consumers from write-ups that force them to pay more depreciation for the same facilities.[87] Here, Empire previously devoted its existing facilities to interstate gas service, as well as intrastate gas service. Moreover, Empire's existing customers, who paid for Empire's existing facilities, are the same customers who will be charged for the acquisition premium. Thus, if the acquisition premium is included in rate base, existing natural gas customers will be paying more for depreciation for the same facilities. For these reasons, we find that EPI is not placing Empire's utility assets into jurisdictional service for the first time. Thus, we find that EPI fails to meet the first prong of the *Longhorn* test.

170.     We also disagree with EPI's assertion that we incorrectly relied on *Enbridge* in the preliminary determination. While we agree that the main focus of the *Enbridge* Order was whether the pipeline was converting its utility assets to a new public use, other orders issued in the *Enbridge* proceedings addressed the issue of whether the facilities were newly placed under the Commission's jurisdiction. For example, in the *Enbridge* rehearing order to which EPI cites, we found that that the pipeline was not dedicating facilities to interstate natural gas service for the first time because it had a limited certificate for certain facilities at the time of the acquisition.[88]

171.     Even if it were found that the acquisition resulted in the facilities being converted to jurisdictional service for the first time, the second prong of the *Longhorn* test requires a pipeline to demonstrate that the acquisition premium provides substantial quantifiable benefits to ratepayers. Here, EPI has not shown that the benefits alleged are directly related to the acquisition. The acquisition premium was paid by NFG, Empire's affiliate, for Empire's existing system and was unrelated to its proposed expansion. Empire will provide service to its existing customers regardless of the expansion facilities, which are being constructed downstream of the existing service. Notably, the existing shippers are

---

[87] *See Enbridge,* 100 FERC ¶ 61,260 at P 58.

[88] *Enbridge,* 102 FERC ¶ 61,310 at P 16 n.17.  *See also Enbridge,* 109 FERC ¶ 61,042 at P 28 (2004) (finding that there was insufficient evidence to determine that the acquisition resulted in any of the facilities being used for jurisdictional gas service for the first time because, among other things, portions of the facilities were being used to provide service under a limited jurisdiction NGA certificate).

Docket No. CP98-150-006, et al.                                    - 52 -

not entitled to use the expansion facilities unless they pay incremental rates for the expansion facilities. Thus, there clearly is no direct benefit to existing shippers from the acquisition.

172.    The $5.3 million in annual benefits to ratepayers claimed by EPI is based on the ability of existing shippers (or replacement shippers via capacity release) to deliver gas to Millennium in order to serve downstream markets in New York City and Long Island and to realize $.05 per Dth in the summer and $.30 per Dth in the winter. The future capacity usage on the existing system, the availability of capacity on the expansion, as well as the future value of capacity between Niagara and Corning are simply not known at this time. Thus, we find that EPI's alleged benefits are speculative and do not provide any certainty that the proposed $36,120,986 acquisition adjustment will be recovered. We conclude that EPI has not met its burden of demonstrating that the $5.3 million in alleged annual benefits is the type of tangible and quantifiable benefit required under the second prong of the *Longhorn* test.

173.    Consequently, for the reasons stated above, we affirm the finding in the preliminary determination that EPI can not include the proposed $36,120,986 acquisition adjustment in its rates.

## 2.    Inflation Adjustment

### a.    Request for Rehearing

174.    The preliminary determination required EPI to remove the proposed four percent inflation adjustment from operation and maintenance (O&M) expenses, administrative and general (A&G) expenses, and taxes other than income for the cost of service of the existing pipeline. The order held that EPI did not demonstrate that the proposed inflation adjustment had any relevance or historic comparability to Empire's existing operating costs and held that it was inconsistent with Commission policy.

175.    EPI contends that the four percent inflation adjustment is reasonable, because it is based on a number of independent third-party measurements of inflation. For example, EPI states that the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics (BLS) increased 3.4 percent between December 2004 and December 2005; that, over the same time frame, the BLS' producer price index for all finished products increased by 5.4 percent; and that the Construction Cost Index published by McGraw Hill's *Engineering News Record* increased by five percent over a recent one year period. EPI contends that these indices in combination reflect changes in costs facing a pipeline company and concludes that its four percent inflation adjustment is proper.

Docket No. CP98-150-006, et al.                                              - 53 -

176.  In addition, EPI asserts that its proposed inflation adjustment has historic comparability to Empire's existing costs.  Specifically, EPI contends that "[b]etween the twelve-month period ending March 31, 2004, and the twelve-month period ending March 31, 2006, Empire's operating and maintenance expenses increased from $3,582,159 to $4,128,291, an average annual increase of 7.6 percent, and that its property taxes increased from $4,653,217 to $4,896,480, an average annual increase of 2.59 percent."[89]  EPI also maintains that the cases cited in the preliminary determination are distinguishable, contending that it does not propose an inflation tracker as in *Columbia Gulf Transmission Co.* (*Columbia Gulf*)[90] and that its proposals are supported by actual data unlike in *Williston Basin Interstate Pipeline Co.* (*Williston Basin*)[91] and *Transcontinental Gas Pipe Line Corp.* (*Transco*).[92]

177.   EPI claims that the Commission recognized the need to use projections and account for inflation from historical data in establishing initial rates in *Maritimes & Northeast Pipeline* (*Maritimes*).[93]

### b.    Commission Holding

178.   In this proceeding, EPI developed its cost of service for its existing facilities using a base period of 12 months of actual expenses ending March 31, 2005.  EPI increased the base period actuals for O&M, A&G, and taxes other than income taxes by a four percent inflation adjustment per year in order to derive the proposed expenses for the projected in-service date of November 1, 2007.[94]  On rehearing, EPI claims that between the 12-month period ending March 31, 2004 and the 12-month period ending March 31, 2006, its O&M expenses showed an average annual increase of 7.60 percent and its property taxes showed an average annual increase of 2.59 percent.

---

[89] EPI's rehearing request at 29.

[90] 75 FERC ¶ 61,206 at 61,682 (1996).

[91] 56 FERC ¶ 61,360 at 61,371 (1991).

[92] 11 F.P.C. 94 at 106-07 (1952).

[93] 80 FERC ¶ 61,346 at 62,185 (1997).

[94] EPI proposes an inflation adjustment of $464,303 for O&M and A&G expenses and $513,830 for taxes other than income.

Docket No. CP98-150-006, et al.                                            - 54 -

179.    We do not permit a pipeline to adjust its actual cost of service components to include an inflation adjustment because an inflation adjustment is not the type of "known and measurable" costs contemplated by our regulations.[95]  On their face, the numbers presented by EPI do not support its claim that certain of its cost components will increase by four percent due to inflation on an annual basis until November 2007.  We note that EPI based its cost of service on actual expenses for the 12 months ending on March 31, 2005.  However, the effect of inflation over this period has already been included in EPI's proposed cost of service.  Moreover, EPI is using a measure of inflation for the 2004-2005 period to increase certain cost components not only to the end of 2005, but through October 2007.  There is nothing in the record that supports the proposition that the inflation factors for 2004-2005 will continue over this extended period.  Also, it is unclear whether these increased costs are due to inflation or attributable to increased plant costs.  Finally, EPI's analysis is incomplete because it fails to include any analysis of A&G costs.  In short, EPI's claim that certain cost components of its rates will increase by four percent on an annual basis until its proposed in-service date of November 2007 is speculative.[96]

180.    EPI's reliance on the Commission's decision in *Maritimes* to support its proposed inflation adjustment is misplaced.  Maritimes was a new pipeline company that based its proposed cost of service on estimates at the time of filing.  In that decision, we wanted to ensure that Maritimes' proposed rates and a competing pipeline's rates were stated on a comparable basis.  Thus, we directed Maritimes to update its estimates based on the more current cost estimates that had been used by the competing pipeline.  Here, in contrast, EPI will take over operation of an existing pipeline with actual cost data.  EPI is not proposing to update its expenses based on more current information; rather EPI is using inflation factors to project the level of its expenses to November 2007, or more than two years from the date of the filing.  Thus, the *Maritimes* case is distinguishable from the proposal here.

---

[95] *See Williston Basin,* 56 FERC at 61,371; *Columbia Gulf Transmission Co.,* 67 FERC ¶ 61,242 at 61,802 (1994).

[96] Because EPI's projections are not supported by actual data, we find that its attempt to distinguish the *Williston Basin* and *Transco* cases is not relevant here.  We agree with EPI that its proposal does not constitute the type of tracker that was rejected in *Columbia Gulf.*

Docket No. CP98-150-006, et al.                                                    - 55 -

181.   For these reasons, we find that EPI's reliance on general trends in inflation to support the inclusion of an inflation adjustment is speculative and is not a good predictor of its actual costs.  Thus, the preliminary determination did not err in requiring EPI to remove the proposed four percent inflation adjustment from O&M, A&G, and taxes other than income for the cost of service of the existing pipeline.  Nevertheless, if EPI experiences increased expenses due to inflation or otherwise, it may file under section 7 to amend its certificate filing to reflect such updated expenses prior to placing the facilities into service, or submit a section 4 filing after the facilities are placed into service.  This approach is consistent with our policy[97] and with our holding in *Maritimes*.

### 2.   Treatment of Interruptible Revenues

#### a.   Request for Rehearing

182.   EPI proposed to allocate interruptible transportation revenues of $191,000 on Empire's existing system and to credit a portion of interruptible revenues to firm and interruptible shippers using the connector facilities.  The preliminary determination held that the proposed $191,000 allocation of interruptible revenues only reflected transportation on the existing system for the 12-month period that ended March 31, 2005 and that EPI projected no throughput as a result of the proposed expansion of its system.  The preliminary determination also required EPI to credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers paying the maximum rates.  Finally, the preliminary determination directed EPI to adequately explain and justify the difference in treatment of interruptible revenues between the existing pipeline and the connector pipeline.

183.   EPI states that the $191,000 reflects the actual level of interruptible transportation on Empire's system for the 12-month period that ended March 31, 2005 and reflects the reality of Empire's recent operations.  EPI contends that the finding in the preliminary determination is not consistent with existing policy since pipelines may choose to allocate fixed costs to interruptible service or to credit the interruptible revenues to firm and interruptible shippers.  As to the requirement that it credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers, EPI asserts that the two cases that the order relied on do not support this requirement.

184.   For the connector pipeline, EPI explains that section 18.3 of the GT&C provides for the crediting of a portion of interruptible revenues to firm and interruptible shippers

---

[97] Interim Order at P 116.