Docket No. CP98-150-006, et al.                                                    - 56 -

using that pipeline. The percentages that would be used for the credit would be the capacity that is subscribed on the connector facilities. EPI claims this approach is reasonable because it should be permitted to retain revenues associated with capacity for which it is at risk.

## b.    Commission Holding

185.    In regard to new interruptible services, we require a 100 percent credit of interruptible revenues, net of variable costs, to firm and interruptible customers or an allocation of costs and volumes to these services.[98] For the existing pipeline, EPI allocated $191,000 to interruptible service which is equal to its interruptible revenues for the 12 months ended March 31, 2005. This is the same period used by EPI to design its rates. While the throughput may increase on the existing pipeline due to EPI's expansion, the increase in throughput is not known at this time. With the uncertainty concerning projected increases in throughput on EPI, we will grant rehearing and remove the condition that EPI credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers for the existing pipeline.

186.    However, for the connector pipeline, we find that EPI did not provide sufficient support to deviate from our policy. In the absence of an allocation of costs to this service, we will require EPI to credit 100 percent of interruptible revenues to the firm and interruptible recourse rate shippers using the connector pipeline.[99] Because EPI has not assumed any risk associated with interruptible service, requiring 100 percent crediting is appropriate whether or not the pipeline is fully contracted on a firm basis.

## 3.    Discount Adjustment

### a.    Request for Rehearing

187.    The preliminary determination found that a discount adjustment may be appropriate, but that EPI must make a filing recalculating the proposed adjustment. As

---

[98] *E.g., Maritimes & Northeast Pipeline, L.L.C.*, 80 FERC ¶ 61,136 at 61,475, *order on reh'g*, 81 FERC ¶ 61,166 at 61,725-26 (1997); *Steuben Gas Storage Co.*, 75 FERC ¶ 61,331 at 62,068 (1996).

[99] *See Steuben Gas Storage Co.*, 75 FERC ¶ 61,331 at 62,068 (1996); *Young Gas Storage Co., Ltd.*, 67 FERC ¶ 61,375 (1994); *National Fuel Gas Supply Corp.*, 62 FERC ¶ 61,200, *order on reh'g*, 63 FERC ¶61,291 (1993).

Docket No. CP98-150-006, et al.                                       - 57 -

part of the filing, the order required EPI, among other things, to exclude any negotiated rate contracts and, for any discounts given to affiliates or non-affiliates, EPI must show that the discount was given for competitive reasons.

188.   EPI contends that Empire's rates are bounded by the applicable minimum and maximum rates established by the New York PSC and that none of Empire's current agreements are negotiated rate agreements in the negotiated/recourse rate context. While EPI acknowledges that the rate provisions under some existing agreements would not fall completely within the straight-fixed variable maximum and minimum rates under EPI's FERC tariff and that EPI would need to file these discounted agreements as negotiated rate agreements, EPI asserts that we should not exclude these discounted agreements from the discount adjustment calculations.

189.   EPI also seeks clarification that the usual presumption that discounts to non-affiliates are competitively justified is applicable to EPI. In addition, EPI seeks clarification that a currently effective long-term discount granted to National Fuel Gas Distribution Corporation (National Fuel Distribution) will be considered a non-affiliated discount to which such presumption applies, because National Fuel Distribution was not affiliated at the time the discount was negotiated, even though it is an affiliate now.[100]

b.    **Commission Holding**

190.   We will permit EPI to include in its proposed discount adjustment the billing determinants related to the contracts resulting from the existing system that will convert to service under EPI's Part 284 tariff.[101] EPI adequately explained that these contracts were priced on a cost-of-service basis and that the company did not assume the risk of under recovery. We will also clarify that the presumption that discounts given to non-affiliates are competitively justified is applicable here.[102]

191.   Regarding the National Fuel Distribution transportation contract, we note that National Fuel Distribution was not affiliated with Empire at the time the contract was

---

[100] Empire entered into a 20-year discount agreement with National Fuel Distribution in 1994 more than eight years prior to NFG's acquisition of control of Empire in 2003. NFG is EPI's corporate parent.

[101] The issues relating to Empire's existing contracts are addressed below.

[102] E.g., *Williston Basin Interstate Pipeline Co.*, 67 FERC ¶ 61,137 at 61,379-80 (1994); *Southern Natural Gas Co.*, 65 FERC ¶ 61,347 at 62,831 (1993).

Docket No. CP98-150-006, et al.                                                    - 58 -

entered into in 1994. NFG did not acquire an interest in Empire until 2003. Thus, we
find that this contract is an arm's-length transaction and can be treated as a non-affiliated
transaction for purposes of calculating the discount adjustment.[103]

    **4.**    <u>Rate of Return</u>

        **a.**    **Request for Clarification**

192.   The preliminary determination adopted a 12.5 percent return on equity and a
capital structure of 60 percent debt and 40 percent equity for Empire's existing facilities.
EPI contends that the order does not explicitly address total return or debt costs. EPI
requests clarification that the Commission meant to adopt the 10.16 percent total return
(including the 8.6 percent debt cost component) approved by the New York PSC for the
existing facilities.

        **b.**    <u>Commission Holding</u>

193.   Our intent in the preliminary determination was to adopt the rate of return
components underlying Empire's existing rates approved by the New York PSC. As
requested, we will clarify that EPI is authorized to adopt an overall rate of return of
capital of 10.16 percent, which includes the 8.6 percent debt cost underlying Empire's
current New York PSC approved rates.

    **5.**    <u>LAUF</u>

        **a.**    <u>Request for clarification</u>

194.   The preliminary determination required EPI to "revise its tariff to state the date
that it will file an annual fuel reimbursement report for each year to support the
compressor fuel and LAUF gas factors used for a 12-month period" and required EPI "to
revise its tariff to provide that if a negative compressor fuel or LAUF gas factor occurs on
a given month, that negative balance must be carried forward to the next month."

195.   EPI requests clarification, contending that the references to LAUF must have been
inadvertent. EPI contends that section 23.2 of its GT&C provides that compressor fuel
will be recovered via a compressor fuel factor, posted on its website on a monthly basis.

---

    [103] Our finding assumes that the contract will not be renegotiated in the future. If
the contract is renegotiated, EPI will have to justify a discount given to an affiliate.

However, EPI explains that the recovery of LAUF is governed by section 23.4, which
provides that actual LAUF experienced during a month will be reflected in each shipper's
cumulative imbalance for that month and resolved pursuant to its imbalance resolution
process.

### b.     Commission Holding

196.    We will grant EPI's request for clarification, since LAUF will be not be recovered
through the same monthly posting mechanism as compressor fuel. However, consistent
with the requirement we imposed for compressor fuel, we will require EPI to file an
annual report in support of the LAUF volumes during each year.

### 6.     Deferred New York State Taxes

#### a.     Request for Clarification

197.    The preliminary determination permitted a three-year amortization of deferred
New York state taxes ($1,161,936 per year, reflecting a three-year amortization of
$3,485,808). The order also held that EPI should separately report the recovery of this
expense in its three-year cost and revenue study or in a section 4 rate case.

198.    The New York PSC requests clarification, or in the alternative rehearing, that the
three-year amortization of deferred state income taxes will be collected as a separate
surcharge over a three-year period, rather than being included in EPI's initial rates. If it
is included in initial rates, the New York PSC contends that this will guarantee that EPI
will overrecover the deferred amount.

#### b.     Commission Holding

199.    The deferred state income tax amount is a non-recurring expense. Upon further
consideration, we agree with the New York PSC that because this is a non-recurring item,
it is appropriate to ensure that EPI collects no more than the deferred amount. We find
that the New York PSC's request that the three-year amortization of deferred state
income tax be collected as a separate surcharge is a reasonable approach to achieving this
objective. EPI could also file a separate set of initial rates, with these deferred amounts
excluded, that would become effective when EPI fully recovers its deferred tax balance.
Thus, when it re-files its initial rates, we will require EPI to adopt one of these two
methods for recovering its deferred state income tax amount.

Docket No. CP98-150-006, et al.                                    - 60 -

7.    **Non-Conforming Service Agreements**

a.    **The Preliminary Determination**

200.    In the application, EPI stated that Empire currently provides firm transportation service under four contracts that were executed within the regulatory framework of the New York PSC (existing contracts).  EPI proposed to continue to provide service under the existing contracts under its Part 284 blanket certificate for the duration of the term of the contracts.  EPI's *pro forma* tariff proposal included two *pro forma* service agreements – a New York PSC *pro forma* service agreement that would have been applicable to the existing contracts and a *pro forma* service agreement for new Part 284 firm shippers transporting gas on the existing or the expansion portions of the pipeline (standard *pro forma* service agreement).  EPI stated that the existing contracts materially deviated from its New York PSC *pro forma* service agreement and sought a determination from the Commission accepting such contracts as non-conforming agreements.[104]  Citing the competitively sensitive nature of the agreements, EPI filed public and non-public versions of its application, seeking privileged treatment for the existing contracts and EPI's summaries of their non-conforming provisions in the non-public application.

201.    The preliminary determination directed EPI to remove the New York PSC *pro forma* service agreement, as well as any reference to the New York PSC agreements in its proposed tariff.  The order also required EPI, in order to provide jurisdictional service to existing customers, to renegotiate its existing contracts using the standard *pro forma* service agreement as the starting point for drafting any negotiated rate or contract.  Further, to the extent that EPI seeks to grandfather any provision in the existing contracts, the order directed EPI to file the agreements reflecting the deviations from the standard *pro forma* service agreement in red line/strike out format.  In such filing, the order required EPI to explain the basis for any deviations and demonstrate that the deviations are not unduly discriminatory.

202.    The preliminary determination denied EPI's request for confidential treatment.  In denying this request, the order stated that where a contract deviates materially from the form of service agreement, the Commission and the public have not had an opportunity to

---

[104] EPI also noted that some of the non-conforming provisions are included in supplemental agreements to the existing contracts, and that "agreements of this kind are disfavored" by the Commission.  Nonetheless, EPI requested that the Commission accept the supplemental agreements as reflecting the regulatory environment in which they were executed.

Docket No. CP98-150-006, et al.                                      - 61 -

review the material deviation, and the contract must be filed and made public.[105] The order explained that public disclosure of contracts with material deviations is required, because such disclosure prevents undue discrimination through secret rates or terms. Consequently, the order directed EPI to make public its service agreements, if the agreements have a material deviation from the standard form of service agreement in EPI's tariff. The order required such agreements to be filed at least 30 days prior to the commencement of service.

## b.    **Requests for Rehearing**

203.    EPI requests that it be permitted to continue to provide service under the existing contracts, subject to the terms and conditions of its proposed FERC tariff, and that the Commission act on the request it made in the application for an up-front determination accepting the existing contracts as non-conforming agreements.

204.    EPI claims that we erred in rejecting the request to preserve its existing contracts based on reasons that relate solely to the New York PSC *pro forma* proposal.[106] Specifically, EPI points out that our rejection focused on references in the existing contracts to the New York PSC, to services and rate schedules that Empire offered as an intrastate pipeline but are not included in its FERC tariff, and to certain provisions in the New York PSC *pro forma* service agreement (*force majeure*, waiver, warranty, and indemnification) that are not consistent with EPI's proposed FERC tariff. EPI asserts that our reasons do not justify a rejection of the request to preserve the existing contracts, because these inconsistencies will disappear with the removal of the New York PSC *pro forma* service agreement.

205.    EPI also contends that we erred in failing to make an up-front determination accepting the four existing contracts as non-conforming agreements.[107] EPI states that it

---

[105] 18 C.F.R. § 154.1(d) (2006).

[106] EPI states that it does not seek rehearing of the rejection of the New York *pro forma* proposal and that it will remove the New York *pro forma* tariff and references to it from its FERC tariff.

[107] On October 5, 2006, Sithe/Independence Power Partners, L.P., one of the four shippers with an existing contract, withdrew its request for rehearing and clarification of the preliminary determination, stating that it had reached an agreement on rates, terms, and conditions of service with EPI and that the service agreement reflecting the

(continued)

Docket No. CP98-150-006, et al.                                          - 62 -

is aware of our strong preference for non-conforming service agreements to originate from *pro forma* agreements in a pipeline's tariff, but contends that this policy cannot be applied to Empire and other state-regulated pipelines with long-term agreements that were in effect for many years prior to the pipeline's becoming jurisdictional. EPI believes this policy would result in abrogation of its existing agreements. As an alternative, EPI proposes that we focus on whether the existing contracts contain provisions that create a conflict with our substantive policies or give rise to undue preference or discrimination.

206.    EPI maintains that the existing contracts will not compromise our substantive policies, since EPI will provide unbundled transportation under the provisions of Part 284 and other applicable regulations.[108]  Also, EPI claims that the existing agreements will not give rise to undue discrimination or preference, since the differences between the proposed FERC *pro forma* tariff and the existing New York PSC *pro forma* tariff are immaterial.[109]  Further, EPI asserts that the provisions in each existing contract that deviate from the New York PSC *pro forma* tariff are not unduly discriminatory or preferential.[110]  Finally, EPI asserts that our decision here is not consistent with Commission precedent, citing the decisions in *Kansas Pipeline Co.* (*Kansas Pipeline*)[111] and *Saltville Gas Storage Co.* (*Saltville*).[112]

---

agreement will conform to the firm transportation form of service agreement in EPI's FERC *pro forma* tariff.

[108] Hess also requests that the Commission permit EPI to continue to provide service in accordance with Hess' contracts for the remaining unexpired terms of the contract.

[109] *See* Exhibit 3, Part 3 of EPI's application or Appendix A to EPI's request for rehearing for a comparison of the differences between the proposed FERC *pro forma* tariff and the existing New York *pro forma* tariff.

[110] *See* EPI's rehearing request at 14-15 for EPI's analysis of the provisions in each pre-existing service agreement that deviate from the New York *pro forma* tariff.

[111]   87 FERC ¶ 61,020, *reh'g denied*, 87 FERC ¶ 61,329 (1999).

[112] 109 FERC ¶ 61,353 (2004).

Docket No. CP98-150-006, et al.                                                          - 63 -

207.   EPI acknowledges that we do not usually make decisions on non-conforming agreements during certificate proceedings, but maintains that these agreements represent a large percentage of its existing business and that it needs an up-front determination that these agreements will be allowed to continue in effect before proceeding with spending $144 million to construct the connector project.

### c.    Commission Holding

208.   In the preliminary determination, we did not reject or otherwise rule on the merits of grandfathering any provision contained in the existing contracts into EPI's jurisdictional contracts. Rather, we ruled that EPI must renegotiate its existing contracts using its standard FERC *pro forma* service agreement as the starting point for drafting any negotiated rate or contract consistent with our policies.[113] The order also stated that to the extent EPI seeks to grandfather any provision in the existing contracts, EPI must file the agreements reflecting the deviations from the standard FERC *pro forma* service agreement in red line/strike out format, explaining the basis for any deviations and demonstrating that the deviations are not unduly discriminatory.[114] After EPI complies with this directive, we will rule on the merits of any requests to grandfather provisions of the existing contracts, consistent with our policies on non-conforming service agreements.

209.   We disagree that there is no valid basis for requiring the renegotiation of the existing contracts. In this proceeding, EPI proposes to provide jurisdictional service which requires that its contracts be based, to the maximum extent possible, on EPI's Commission-approved jurisdictional tariff. Moreover, to the extent that a provision in a contract is to control over a generally applicable tariff provision, it must be clearly delineated so that there is no ambiguity regarding what provision is applicable. The preliminary determination is also consistent with the requirements of the NGA and our regulations that require that service be provided in a not unduly discriminatory manner. Finally, our action here is consistent with the decisions in *Kansas Pipeline* and *Saltville*. In those proceedings, we did not merely accept the existing contracts with customers as jurisdictional contracts, as EPI requests us to do here. Rather, we required the companies to renegotiate contracts with their existing customers using the *pro forma* service agreement approved by the Commission, and to file any contracts that contained

---

[113] *See National Gas Pipeline Negotiated Rate Policies and Practices,* 104 FERC ¶ 61,134 (2003).

[114] EPI's Preliminary Determination at P 136.

Docket No. CP98-150-006, et al.                                        - 64 -

deviations as non-conforming service agreements.[115] This is exactly the procedure we
have directed EPI to follow here.

210.    We also clarify that it is our intent to rule in this proceeding on the merits of any
non-conforming provision contained in a renegotiated contract filed by EPI consistent
with our directives in the preliminary determination.  While we do not usually review
non-conforming contracts in the context of a certificate application, we will do so here
because of the unique issues regarding the renegotiation of the existing contracts.  In
order that we have sufficient time to complete our review of any non-conforming
contracts filed by EPI, we will require EPI to file any renegotiated contract containing
non-conforming provisions at least 90 days prior to the commencement of service, rather
than the 30 days required in the preliminary determination.

### 8.    Compliance Filing

#### a.    Preliminary Determination

211.    In EPI's preliminary determination, we required EPI to revise its Rate
Schedule FT and IT recourse rates relating to various rate base and rate design issues
for service on the existing and connector pipelines.  Further, we required that a cost and
revenue study be filed within the first three years of actual operations and required
numerous revisions to the *pro forma* tariff.  We will discuss below EPI's compliance
filing.

#### b.    Commission Holding

212.    EPI revised the recourse rates for Rate Schedule FT and IT service by:
(1) eliminating the proposed $36 million acquisition adjustment for service on the
existing pipeline; (2) adjusting the cash working capital for the existing and connector
pipelines, consistent with the lead-lag study included in its March 17, 2006 supplemental
data response; (3) removing the proposed inflation adjustment for O&M and taxes other

---

[115] *See Kansas Pipeline Co.*, 83 FERC ¶ 61,107 at 61,509 (1998) (clarifying that
the applicant needs to file its new service agreements with existing customers only if they
are materially different from the authorized Form of Service Agreement; *Saltville*,
109 FERC ¶ 61,353 at P 5 (2004) (granting request for additional time to file non-
conforming service agreements, based on the recognition that Saltville and its customers
could not initiate discussion with respect to any revisions to their preexisting contracts
without knowing what Saltville's new initial rates and tariff would require).

Docket No. CP98-150-006, et al.                                          - 65 -

than income taxes applicable to its existing pipeline; (4) adjusting the depreciation rate for the existing pipeline reflecting a 2.5 percent rate; (5) adjusting the rate of return on equity to 12.5 percent, with a capital structure of 60 percent debt and 40 percent equity and debt cost of 8.60 percent for the existing pipeline, which reflects the rates approved by the New York PSC; and (6) recalculating the discount adjustment for the existing pipeline applying the iterative process, using as a starting point the revised cost of service and unadjusted billing determinants. We find that EPI's proposed changes to the rates comply with the changes required in our preliminary determination and we accept them as proposed.[116]

213.    In compliance with the preliminary determination, EPI revised its *pro forma* tariff. EPI revised provisions about: (1) the reimbursement of fuel, company-use, and LAUF; (2) using the FERC *pro forma* service agreements for all its contracts; (3) the *force majeure* definition; (4) parking and lending service; (5) netting and trading of imbalances; (6) reservation charge credits; (7) imbalance resolution; (8) liability in damages; (9) capacity release; (10) reservation of capacity for expansion projects; (11) requests for service involving construction of new facilities; and (12) miscellaneous tariff changes.[117] EPI also made other minor revisions for corrections and typographical errors.[118]

214.    We note that EPI has included in its applicable rate sheets at *pro forma* Sheet Nos. 6 and 7, the Annual Charge Adjustment (ACA) of $0.0018 based on 2005 levels. When EPI files its tariff sheets, we will require EPI to change the ACA surcharge on Sheet Nos. 6 and 7 from $0.0018 to $0.0000. Section 154.402 of the regulations requires a company to pay its bill for annual charges before applying the ACA unit surcharge to its rates. Except for the changes to EPI's ACA surcharge, we accept the proposed changes to the tariff sheets as consistent with the preliminary determination.[119] We will

---

[116] As discussed above, we denied EPI's rehearing requests on several rate issues.

[117] When responding to the requests for rehearing and clarification above, we addressed several tariff issues. We will require EPI to modify its tariff to conform with our discussion of those issues.

[118] We will accept EPI's proposal not to change the periodic adjustment provision in section 18.1 of the GT&C, finding that it is consistent with section 154.403 of the regulations.

[119] We will accept EPI's additional corrections and other minor revisions to its *pro forma* tariff.

Docket No. CP98-150-006, et al.                                                                    - 66 -

also require EPI to file actual tariff sheets at least 90 days before the in-service date of its facilities to reflect compliance with the NAESB standards in effect at that time and the modifications discussed in this order and the preliminary determination.

### 9.    Conclusion

215.    The preliminary determination found that EPI's proposed facilities would be constructed without subsidies; that there were no identified adverse effects on existing customers, other pipelines, landowners, or communities; and that EPI's proposed facilities would be the upstream supply link in the NE-07 project. Thus, pending environmental review, the preliminary determination approved EPI's proposals. We affirm those findings here and conclude that EPI's proposals are in the public convenience and necessity.

### G.    Environment

216.    On January 10, 2006, we issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement* (NOI) for the NE-07 project.[120] The NOI was sent to approximately 2,781 individuals and organizations, including affected landowners along the project route and site locations; landowners within one-half mile of the new and modified compressor stations; federal, state, county, and local agencies; elected officials (United States representatives and senators, state governors, and other local and state representatives); environmental and public interest groups; Native American tribes; local newspapers and libraries; and other individuals. The NOI was published in the *Federal Register*.

217.    The NOI requested written comments on the scope of the analysis for the draft supplemental EIS and requested federal, state, and local agencies with jurisdiction and/or special expertise regarding environmental issues to cooperate with the Commission in preparation of the draft supplemental EIS. The scoping period ended on February 10, 2006, although our staff accepted public and agency comments after this date, to the extent practicable, and these comments were addressed in the draft supplemental EIS.

218.    On June 15, 2006, we issued a Notice of Availability (NOA) of the draft supplemental EIS that established a comment period ending on July 31, 2006. We mailed the draft supplemental EIS to 3,273 agencies, groups, and individuals. We received

---

[120] A final environmental impact statement (EIS) for Millennium's and Columbia's original proposals was issued in October 2001.

Docket No. CP98-150-006, et al.                                    - 67 -

56 comment letters from four federal agencies, eight state agencies and state representatives, two Indian nations, two county and municipal agencies, and 32 individuals and groups.[121]  In addition, on July 18, 2006, we held a public meeting at Brookfield, Connecticut to receive comments on the draft supplemental EIS.  We addressed all comment letters on the draft supplemental EIS and oral comments from the public meeting in Appendix I of the final supplemental EIS.

219.    Our staff prepared the final supplemental EIS to consider the environmental impacts of the proposed NE-07 project.  The final supplemental EIS incorporates the analysis in the October 2001 final EIS for Millennium's original proposals and the environmental assessment for Iroquois' original proposals.[122]  The final supplemental EIS updates the information included in the 2001 final EIS for Millennium and the environmental assessment for Iroquois and provides an analysis of the project proposed here.  The final supplemental EIS addresses the purpose and need for the NE-07 project; alternatives to the proposed route and to aboveground facilities, including the "no-action" alternative; geologic resources and hazards; soils; groundwater and surface water; wetlands; vegetation and wildlife; fisheries, including essential fish habitat; endangered and threatened species; land use including residential areas, recreation and public interest areas, Coastal Zone Management Consistency, and visual resources; cultural resources; air quality and noise; and reliability and safety.

220.    On October 13, 2006, we issued an NOA of the final supplemental EIS.  The final supplemental EIS was mailed to 1,016 federal and state agencies, local governments, elected officials, interveners, and individuals who filed comments with the Commission or requested to be on the mailing list for environmental documents.

221.    After the NOA was issued, and after the final supplemental EIS went to print, we received comments from the Environmental Protection Agency (EPA) and the United States Department of the Interior, Office of the Secretary, Office of Environmental Policy and Compliance (DOI).  In its October 31, 2006 comments, the EPA states that based on its review of the final supplemental EIS, it does not believe that the NE-07 project will cause significant adverse impacts to environmental and cultural resources.  In comments filed November 15, 2006, the DOI states that it will provide a letter of concurrence or

---

[121] A few commenters submitted more than one comment.

[122] We issued the environmental assessment for Iroquois' proposals in August 2002.

Docket No. CP98-150-006, et al.                                          - 68 -

non-concurrence under separate cover to the Commission and the United States Army
Corp of Engineers (COE).[123]

222.    We also received comment letters from the United States Department of
Commerce, National Oceanic and Atmospheric Administration; the Oneida Indian
Nation; the National Marine Fisheries Service (NMFS); Ms. Alice Supa; Mr. Peter
Supa;[124] Mr. Donald Lewis; the Northern Tuxedo Residents Association; Laura and
Brandon Rainoff; and Ms. Colleen Carroll.  The New York State Office of Parks,
Recreation and Historic Preservation (OPRHP) and Palisades Interstate Parks
Commission (PIPC) filed joint comments.  Algonquin and EPI also filed supplemental
information.  Algonquin's supplement reported about its survey for Indiana bats.  EPI's
supplement requests a slight route variation.[125]

## 1.    Alternatives

223.    In accordance with the National Environmental Policy Act of 1969 (NEPA)[126] and
the Commission's policy, our staff evaluated alternatives to each section of the NE-07
project to determine whether it would be reasonable and environmentally preferable to
the proposed action.  As part of this evaluation, we examined the "No Action" or
"Postponed Action" alternative for each project component.  In addition, our staff
evaluated system alternatives, major route alternatives, minor route variations, and
aboveground facility alternatives for each component of the NE-07 project.

224.    We also compared the original Millennium project to the NE-07 project.  The
original Millennium project required approximately 5,956 acres for construction,
including approximately 797.6 acres in the United States portion of Lake Erie.  The
permanent land requirement for easements and aboveground facilities required
approximately 3,139 acres.  The land requirement for the NE-07 project will be

---

[123] The DOI's comments about wetland and waterbody impacts are included in the
discussions relating to surface water and wetlands below.

[124] Ms. Alice Supa's letters were filed on October 19 and November 15 and 21,
2006.  Mr. Peter Supa's letters were filed on November 16 and 17 and December 19,
2006.

[125] We will address the comments letters, as well as EPI's and Algonquin's filings,
under the appropriate topic headings below.

[126] 42 U.S.C. § 4321 *et seq.*

Docket No. CP98-150-006, et al.                                      - 69 -

approximately 3,494.9 acres for construction and 1,683.5 acres for operation of the proposed facilities.

225.    The NE-07 project will have less impact on waterbodies than the original Millennium project, since the NE-07 project will not include 32.9 miles of construction in the United States waters of Lake Erie or a 2.1-mile-long crossing of the Hudson River.

226.    The NE-07 project will also have less impact on wetlands than the original Millennium project. Construction of the original Millennium project would have directly affected approximately 414.3 acres of wetlands and operation would have affected an estimated 247.8 acres of wetlands. In contrast, the NE-07 project will affect approximately 228.7 fewer wetland acres during construction and 128.4 fewer acres during operation. Also, impacts to all wetland types will be less for the NE-07 project. For example, the original Millennium project would have affected an estimated 71.6 acres of forested wetlands during construction and 43.8 acres during operation. The NE-07 project will reduce impacts to forested wetlands during construction by approximately 39.9 acres and permanent impacts by 22.5 acres.

a.    **Millennium**

(1)    **The NYSEG Variations**

227.    Millennium developed the NYSEG variations after consultations with NYSEG identified the need to move the pipeline so that it would be at least 55 feet from grounded powerline structures in certain areas. The consultations were a requirement of the Interim Order.[127] The final supplemental EIS compared segments of the previously approved Millennium pipeline route to the NYSEG variations that Millennium proposed here.[128]

228.    Some affected landowners filed comments about the NYSEG variations. They were concerned about the project's impact on their properties and suggested that the pipeline be constructed elsewhere. We addressed similar suggestions from commenters that the pipeline be constructed elsewhere in the final EIS for the original Millennium project, as well as in the Interim Order and the 2002 *Millennium* Order. In addressing the

_____

[127] *See* environmental condition 45.

[128] The NYSEG variations include the Chemung route variation, the Tioga-Broome route variation, and the Delaware route variation. The NYSEG variations are located along NYSEG's powerline.

Docket No. CP98-150-006, et al.                                            - 70 -

comments, the final supplemental EIS determined that no new information had been filed to support modifying the pipeline route. [129]

(a)    <b>The Supa Family</b>

229.    The Supa family resides near the Tioga-Broome route variation, which runs from MPs 232.2 to 243.5.

230.    In her October 19 and November 15, 2006 letters, and in his November 16, 2006 letter, Ms. Alice Supa and Mr. Peter Supa, respectively, filed comments, asserting that the Millennium pipeline should follow Columbia's Line A-5, rather than the powerline through there property. [130]  In supporting the Line A-5 route, or a route close to Line A-5, Ms. Supa refers to information that was filed in 1998, including a Millennium data response concerning a route 75 feet down slope from Line A-5 off Boswell Hill Road. Ms. Supa believes that the route should be changed from the powerline, since the pipeline will impact the front yard of a residence; be close to a working barn; and will destroy wells, septic systems, a pet cemetery, a pond, a hunting cabin, and a water supply system on her property or her neighbors' properties.  She states that the "DEC" has a concern about "fault currents."

231.    Mr. Peter Supa asserts that when the pipeline was moved to the route along the powerline corridor it created an identical problem for the properties on Bradley Creek Road.  Further, Mr. Supa contends that Millennium's proposals should be considered a "greenfield" project since the pipeline will be constructed along and outside of the existing powerline corridor rather than within the corridor and between the powerline towers as originally contemplated.  Mr. Supa asserts that if Line A-5 is replaced along a segment of pipeline that is less than one-half mile from the Mitchell and Lewis properties, there will be no homes within the 150 foot requirement and that a "dangerous and aging" pipeline will be removed.

232.    We addressed alternatives to the Millennium pipeline route along the powerline through the Supa property in the final EIS for the original Millennium project, the 2002

---

[129] In comments filed November 15, 2006, the OPRHP supports the selection of the Chemung variation.

[130] Representative Sherwood Boehlert also filed these comments for Ms. Supa and requested that they be included in the record.

Docket No. CP98-150-006, et al.                                                    - 71 -

*Millennium* Order,[131] and in the final supplemental EIS for the NE-07 project. In each instance, we concluded that the pipeline route along the powerline was preferable to following Line A-5 in this area. This includes the alternative routes mentioned by Mr. Supa. We did not see the need to obtain any additional information about the offset route along Boswell Hill Road since field observation of the route, the close proximity of several residences adjacent to the existing pipeline right-of-way, and additional impact identified by residents along Boswell Hill Road showed that it was not a reasonable alternative. For this reason, we did not send Millennium additional data requests and determined that additional analysis was not required. We note that if pipeline construction damages any wells, Millennium will repair or replace the water supplies and provide temporary water supplies until the repairs are made. Millennium will also repair septic systems, if they are damaged by construction. The location of the pet cemetery on the Lewis property was known prior to the 2002 *Millennium* Order, as were the potential impacts to the other features mentioned by Ms. Supa. There is no 150 foot requirement for the separation of natural gas pipelines and residences as Mr. Supa claims.

233.    In regard to Ms. Supa's concerns about "fault currents," environmental condition 45 in the Interim Order required Millennium to consult with the NYSEG regarding pipeline construction and operation adjacent to powerlines between MPs 232.2 to 243.5. As a result of this consultation, Millennium moved its pipeline 55 feet from grounded powerline structures, as recommended by NYSEG. No new information has been filed in this proceeding that would persuade us to modify our prior conclusion that the preferred alignment of the Millennium pipeline is along the NYSEG powerline through the Supa property.

234.    Mr. Supa contends that the Tioga-Broome route variation is a "greenfield" project. The Tioga-Broome right-of-way will be adjacent to the existing powerline right-of-way. It will widen the utility corridor, but it will not create a new corridor. Thus, we conclude that Tioga-Broome route variation will not be a greenfield project.

235.    Ms. Supa states that the Tioga-Broome route variation is not documented in Millennium's August 31, 2006 supplemental filing. Ms. Supa contends that she was surprised to learn of the latest realignment during a January 26, 2006 site visit.

236.    The Tioga-Broome route variation has been a part of Millennium's amended proposals, since Millennium filed its amended application in Docket No. CP98-150-006 in August 2005. In an August 31, 2006 filing, Millennium asserts that it mentioned the

---

[131] 100 FERC at P 206-211.

Docket No. CP98-150-006, et al.                                        - 72 -

possibility of a pipeline realignment within the Supa property downhill from the spring during a January 26, 2006 site visit. Millennium contends that construction impacts can be successfully mitigated along the preferred route and that the alternative alignment mentioned in January 2006 will not be needed. Pending completion of the report about the potential impact of pipeline construction on the Supa water supply system, as required in environmental condition 58 of the Interim Order, we will not require a route change at this point.[132]

### (b)    Mr. Donald Lewis

237.    In his November 20, 2006 comment letter, Mr. Lewis expresses concern about the proximity of the pipeline to wells, sewer systems, a pet cemetery, residences, and apple trees. Mr. Lewis is concerned about construction impacts on streams, springs that feed a pond, access to a hunting cabin, and limits on future land use. Mr. Lewis asserts that Millennium personnel are not willing to work with him and that decisions made at one meeting are changed at the next meeting. Finally, Mr. Lewis states that he did not receive a copy of the final supplemental EIS and that there is no reference to the problems on his property.

238.    On November 29, 2006, Millennium filed a response, contending that it remains committed to working with Mr. Lewis and other stakeholders regarding the project.

239.    We mailed the final supplemental EIS to over 1,000 individuals, organizations, and agencies. We regret that Mr. Lewis did not get a copy.[133] Nevertheless, Mr. Lewis' comments were addressed in Appendix I of the final supplemental EIS. Many of the issues he raised were also addressed in the original Millennium proceeding.

### (c)    Conclusion

240.    For the reasons discussed above, we concur with environmental condition 18, which requires Millennium to use the NYSEG variations, rather than the corresponding pipeline segments previously approved in the Interim Order and the 2002 *Millennium* Order.

### (2)    The Warwick Isle Route Variation

---

[132] *See* the Groundwater discussion below.

[133] We did not learn that Mr. Lewis had not received a copy of the final supplemental EIS until he filed the comment letter.

Docket No. CP98-150-006, et al.                                    - 73 -

241.   The Warwick Isle route variation was developed to avoid a planned residential
development.  We received no comments about this variation.  Thus, we concur with
environmental condition 20, which requires Millennium to use the Warwick Isle route
variation, rather than the corresponding pipeline segment previously approved in the
Interim Order and the 2002 *Millennium* Order.

### (3)    Neversink River

242.   Millennium proposes to acquire and operate a 7.1-mile-long segment of
Columbia's 24-inch diameter Line A-5, which crosses the Neversink River.
Millennium's proposal will avoid direct disturbance to the Neversink River, which is
considered a sensitive waterbody due to the possible presence of federally endangered
species.  Our staff evaluated this proposal.  We concur with the requirement in
environmental condition 19 that Millennium use the existing pipeline segment rather than
replace it with 30-inch diameter pipeline.

### (4)    The Line A-5 Replacement Project

243.   For the Line A-5 replacement project, our staff evaluated three route alternatives
that would avoid construction through the Laurel Ridge community in Tuxedo Park, New
York:  the County Road 84 and Warwick Brook Road alternative; the Route 17/17A
alternative; and the Sterling Forest State Park/Laurel Ridge alternative.  Most of the
comments filed about the Line A-5 replacement project concerned the replacement of
Line A-5 in Laurel Ridge.  Although the Sterling Forest State Park/Laurel Ridge
alternative will affect land within the Sterling Forest State Park, Millennium developed,
in consultation with the PIPC, an Environmental Management and Construction Plan
(EM&CP) which describes the environmental construction and mitigation procedures it
will use to minimize environmental impacts to the park.  We believe that use of the
EM&CP will mitigate construction impacts in the park and that the Sterling Forest State
Park/Laurel Ridge alternative will avoid construction through the Laurel Ridge
residential area.  We agree with the final supplemental EIS' requirement that Millennium
should use the Sterling Forest State Park/Laurel Ridge alternative.[134]

244.   In comments filed November 15, 2006, the OPRHP and PIPC support the
selection of the Sterling Forest State Park/Laurel Ridge alternative.  They recognize that
Algonquin's proposals will require the replacement of a 26-inch diameter pipeline along

---

[134] *See* environmental condition 21.

Docket No. CP98-150-006, et al.                                                    - 74 -

the border of Harriman State Park and that this activity will affect park land. The
OPRHP and PIPC assert that they will work with Algonquin to minimize impacts to
Harriman State Park and its resources, because they expect Millennium and Algonquin to
adhere to the construction and restoration measures identified in its Environmental
Construction Standards (ECS) and the EM&CP for construction in Harriman and Sterling
Forest State Parks.[135]

### (5)    The Ramapo River HDD Variation

245.    Our staff evaluated an alternative to the proposed horizontal direct drilling (HDD)
crossing of State Route 17, the Metro-North Railroad, the Ramapo River, and Interstate
87 on the A-5 replacement project. As proposed, Millennium's line would follow Line
A-5. The alternative would pass through a planned residential community. The
community's real estate developer suggested moving the pipeline closer to the original
Millennium project route along Line A-5. Millennium developed the Ramapo River
HDD variation, which moved the pipeline out of the planned residential development.
We compared the Ramapo River HDD variation to the alternative route and the route
approved for the original Millennium project. We believe that the Ramapo River HDD
variation is reasonable and will avoid the planned residential development. We concur
with the finding in the final supplemental EIS that requires Millennium to use the
Ramapo River HDD variation.[136]

### (b)    EPI

246.    Our staff evaluated numerous broad corridors and minor route variations between
Victor and Corning, New York and determined that EPI's proposed route was reasonable,
because it avoided or minimized impacts to environmental resources and, in particular,
minimized impacts to agricultural resources. Originally, EPI considered looping the
existing Empire system along the northern-most 1.2 miles of the project. However,
during the pre-filing period, and based on landowner input, EPI decided to propose
replacing that segment of pipeline with a larger diameter pipeline to minimize impacts to
abutting landowners. As for the Oakfield compressor station, our staff compared three
aboveground facility site alternatives to the proposed site (Alternative Site 1) and

---

[135] In comments filed November 10, 2006, the Northern Tuxedo Residents
Association also support the selection of the Sterling Forest State Park/Laurel Ridge
alternative.

[136] *See* environmental condition 22.

Docket No. CP98-150-006, et al.                                      - 75 -

concluded that EPI's proposed site was the preferred alternative for the new compressor station.

247.    In an October 23, 2006 filing, EPI reports that it conducted additional pipeline alignment, environmental, and cultural resource surveys along its proposed route during the spring and early summer of 2006.  EPI states that it conducted the surveys on some properties where access had been denied previously, where route modifications were made mainly at the request of landowners, or where issues of constructability were observed.  These route modifications are minor and within the same properties as shown on the route alignment maps filed by EPI in March 2006, with the exception of Variation #53 (between approximate MPs 29.2 and 29.5).  Variation #53 will return the pipeline alignment to the original location proposed in EPI's October 11, 2005 application and will avoid certain impacts to businesses immediately north and south of New York State Route (NYSR) 14A, including an existing drainage system beneath a parking lot (south side of NYSR 14A) and one or more septic system storage tanks (north side of NYSR 14A).  The parking lot is crossed by heavy tractor trailer traffic to one of the businesses. Variation #53 will avoid impacts to these areas and move the pipeline route into an adjacent agricultural area, adding approximately 195 feet to the pipeline length.  EPI did not identify any wetlands, waterbodies, cultural resources, or residences during surveying the alternative route.  Since Variation #53 affects agricultural land, EPI will implement its Erosion and Sedimentation Control and Agricultural Mitigation Plan (ESCAMP), developed in consultation with the New York State Department of Agriculture and Markets (NYSDA&M), for construction in agricultural areas.

248.    On November 17, 2006, EPI filed supplemental information about Variation #53, asserting that it will avoid a saucer-shaped depression on the affected property and some drain tiles where feasible and will repair any tiles that are damaged.  EPI states that it will use the best management practices identified in its ESCAMP for topsoil stripping, management, and replacement.  We find that EPI's use of Variation #53 is reasonable.

(c)    **Algonquin**

249.    Algonquin proposes to replace existing pipeline facilities, modify facilities at three existing compressor stations and a meter station, and construct a new metering and regulating station.  Our staff did not evaluate alternative sites to the proposed modifications of Algonquin's existing compressor stations, because modification of existing facilities is preferable to the construction of new facilities at alternative sites when feasible.  Further, because the proposed replacement of existing pipeline will have less environmental impact and is considered preferable to the creation of new routes or corridors, no major route alternatives or minor route variations were considered for the pipeline replacement portion of the project.

Docket No. CP98-150-006, et al.                                    - 76 -

250.   Algonquin also proposes to construct a new compressor station.  Our staff
evaluated five alternative sites (Sites B through F) to the originally proposed site (Site A)
for the Oxford compressor station.  Subsequently, we issued a *Notice of Alternative
Project Site* to inform the public that Site F was being considered as the preferred site.[137]
The owner of Site A submitted comments, expressing concerns about the proposed use of
the property.  Algonquin commented that the property may no longer be for sale.  The
draft supplemental EIS concluded that Sites A and F would be reasonable for the
compressor station.  On June 13, 2006, Algonquin requested that Site F be considered the
preferred site for the Oxford compressor station.  Local officials also filed comments in
support of Site F, since it would be adjacent to a planned commercial development.  The
Connecticut Siting Council (CSC) independently reviewed the information about the
proposed and alternative sites for the Oxford compressor station and found Site F to be
preferable.[138]

            (d)    **Iroquois**

251.   On October 23, 2006, Ms. Colleen Carroll filed a comment letter that was similar
to several form letters that were filed in opposition to the construction of the Brookfield
compressor station at the High Meadow Road site in Brookfield by Iroquois and to the
construction of the meter and regulation station at the same site by Algonquin.
Ms. Carroll raised concerns about the compressor station's proximity to the Whisconier
Middle School, residences, air quality, aquifer impacts, noise, and alternative locations.
In addition to letters from Ms. Carroll and others, during the scoping and comment period
for the draft supplemental EIS, homeowners in Brookfield expressed concern about these
facilities, as did the Attorney General of Connecticut and other Connecticut state and
local government representatives.

252.   In combination with the final supplemental EIS about Millennium's original
proposals and the environmental assessment about the Brookfield compressor site, our
staff evaluated five alternative sites, including the Vale Road site suggested by the city
officials of Brookfield and other concerned citizens and parties.  The alternative sites are
on properties where the Iroquois and Algonquin pipelines are co-located.  One of these

---

[137] The Notice was issued on March 8, 2006.

[138] On June 30, 2006, the CSC issued its *Findings of Fact and Opinion and
Recommendations* about Algonquin's proposed project in Connecticut.  The CSC's
environmental condition 40 requires Algonquin to use Site F for the Oxford compressor
station.

Docket No. CP98-150-006, et al.                                              - 77 -

sites has been developed and is no longer available. Our staff identified wetlands and other resources on the remaining properties that would limit the available area for construction of a compressor station. Although the Vale Road site alternative is preferred by a number Brookfield residents and public officials who feel that the proposed site is too close to Whisconier Middle School and a number of private residences, we concluded in the *Iroquois* Order that the Vale Road site was not preferable to the High Meadow Road site. Further, we found that the compressor station could be safely constructed and operated at the High Meadow Road site and found no conflicts or significant safety issues with the location relative to the school.

253.    All of the issues raised in Ms. Carroll's comment letter and in other comments were addressed in the final supplemental EIS. Further, similar issues were addressed in the 2002 *Iroquois* Order. In each instance, the Vale Road site was not recommended. The final supplemental EIS determined that construction and operation of the Brookfield compressor station and related facilities at the proposed High Meadow Road site can be accomplished in a safe and reliable manner. The final supplemental EIS also found that the High Meadow Road site is the preferred alternative, if Iroquois constructs and operates the facilities in accordance with the procedures identified in its application and supplemental filings and with the additional mitigation required in environmental conditions 51 to 54. We concur with that finding.[139]

## 2.    Geology

254.    The NE-07 project's impact on exploitable mineral resources will be minimal. The final EIS for the original Millennium project listed active mining operations that would be crossed or would be within 1,500 feet of the pipeline. Millennium's proposed pipeline will not cross any additional active mining operation sites. EPI's right-of-way will cross one active New York State Department of Environmental Conservation (NYSDEC)-permitted sand and gravel pit property south of the New York State Thruway.

255.    Geologic hazards (seismicity, landslides, and karst terrain) will not pose a significant hazard for the project. Blasting will be required in areas of shallow, hard bedrock where other methods of trench excavation are not successful. Where blasting is

---

[139] In its June 30, 2006 Order, the CSC compared the High Meadow Road site to the Vale Road site and found that the High Meadow Road site is the preferred location for the compressor station, because the High Meadow Road site will have less environmental impact and there will be fewer residences in close proximity to the site.

Docket No. CP98-150-006, et al.                                          - 78 -

required, Millennium, EPI, and Algonquin will conduct pre- and post-blast surveys of all
structures with willing landowners and utilities within 150 feet of the construction work
area to assess any damage to existing structures.  Licensed contractors will blast in
accordance with appropriate regulations.  Iroquois does not anticipate the need to blast.

### 3.    Soils

256.   Construction of the NE-07 project will disturb soils and increase the potential for
soil erosion, compaction, loss of soil productivity, and damage to existing drainage tiles.
Each applicant will implement specific erosion and sedimentation control measures
consistent with the Upland Erosion Control, Revegetation, and Maintenance Plan (Plan)
and Wetland and Waterbody construction and Mitigation Procedures (Procedures).
These measures include compaction testing and mitigation and repair of any drainage
tiles damaged during construction.  Approximately 3.3 acres of prime farmland soils, as
classified by the Natural Resource Conservation Service, will be permanently converted
to developed areas at EPI's Oakfield compressor station.  In addition, EPI's pipeline will
cross agricultural areas containing soils with high water tables, which are prone to
compaction.  EPI will implement its ESCAMP, developed in consultation with the
NYSDA&M, to minimize potential impacts on agricultural lands and will develop
overwintering procedures for use in these areas, if restoration cannot be completed before
October 1.  Millennium and EPI will continue to work with the NYSDA&M regarding
specialized construction and overwintering procedures in agricultural areas.  We find that
implementation of these procedures will minimize impact on soils.

### 4.    Groundwater

257.   EPI's proposed facilities overlie four New York State Department of Health-
mapped principal aquifers.  Algonquin's proposed facilities overlie four EPA-designated
principal aquifer areas.  Algonquin's facilities will also overlie two EPA-designated sole
source aquifers, a town-designated aquifer (Haines Pond aquifer system), and a Primary
Recharge Zone of the Town of Brookfield Aquifer Protection District (under Algonquin's
Brookfield meter station and Iroquois' Brookfield compressor station).  The Great
Swamp Aquifer underlies Iroquois' existing Dover compressor station and is a principal
aquifer for the region.

258.   In addition to the private water supply wells and springs listed in the final EIS for
Millennium's original project, the construction areas for the three NYSEG variations and
the Warwick Isle route variation will be within 150 feet of 63 private wells or springs.
Further, we identified seven private water supply wells within 150 feet of the
construction area along the Line A-5 replacement project, nine private wells or springs
within 150 feet of EPI's construction areas, and eleven private water supply wells within

Docket No. CP98-150-006, et al.                                                    - 79 -

150 feet of Algonquin's replacement pipeline construction area. Algonquin plans to conduct pre-construction surveys to verify the presence and location of any other wells within 150 feet of the pipeline construction right of way and its Brookfield meter station. Environmental condition 15 requires that Millennium, EPI, Algonquin, and Iroquois provide an update, prior to construction, to the information filed about locations of water wells and springs within 150 feet of construction workspaces. Environmental condition 16 requires that Millennium, EPI, and Algonquin develop a plan to report any complaints that they may receive during project construction concerning water supply yield or quality and how each was resolved.

259.    All of the applicants have Spill Prevention Control and Countermeasures (SPCC) Plans for their projects that include procedures to avoid spills of hazardous materials, to clean up spills, and to report incidents during construction and operation of the facilities. Environmental condition 42 requires Algonquin to modify its SPCC Plan to address daily vehicle maintenance (*i.e.*, to inspect for leaks to further minimize possible impact due to operation of construction equipment) for consistency with the other applicants' SPCC Plans.

260.    We do not believe that construction and operation of the NE-07 project will adversely affect groundwater quality. The applicants will construct and operate facilities in accordance with approved project-specific environmental construction plans, SPCC plans, and the Plan and Procedures to minimize any potential for groundwater impacts. Also, the applicants will avoid and minimize impacts to groundwater resources by the use of standard and specialized construction procedures. The applicants will identify regulated wellhead protection zones around public groundwater supplies and implement appropriate protection measures during construction and operation in these areas. Further, the applicants will offer to conduct pre- and post-construction testing of private water wells within 150 feet of the construction work areas. If it is determined that any private water supply well is damaged as a result of the project, a temporary source of water will be provided until the damaged supply well is restored to its former capacity.

a.    <u>The Supa Family</u>

261.    In her October 19 and November 15, 2006 letters, and in his November 16 and 17, 2006 letters, Ms. Alice Supa and Mr. Peter Supa, respectively, contend that the wells drilled to study the water supply on their property, as required in the Interim Order, have damaged the family's water system. They allege that the damage includes sedimentation and contamination by a petroleum product. They request that the Commission require Millennium to repair the damage. Ms. Supa also asserts that Millennium "took us to court under the law of eminent domain."

Docket No. CP98-150-006, et al.                                                    - 80 -

262.   As discussed in the 2002 *Millennium* Order, Mr. Peter Supa requested that
Millennium prepare a report with site specific diagrams to illustrate the flow of water to
his spring and cistern and to prepare a plan to avoid his water supply.[140]  Environmental
condition 58 of the Interim Order required Millennium to prepare site specific diagrams
to illustrate the flow of water to the spring and cistern prior to beginning pipeline
construction.  If the results of the testing indicated that the pipeline trench would convey
water away from the spring, we required Millennium to develop engineering and/or other
mitigation measures (including a re-route upslope to avoid the water table) to maintain
uninterrupted flow to the spring and cistern.  To meet this testing requirement,
Millennium installed piezometers in the wells drilled along the pipeline route on the Supa
property and recorded water measurements in the wells for over a year.  We note that
Millennium initiated an eminent domain proceeding in order to get access to the Supa
property to comply with the requirement of environmental condition 58.

263.   The Supa property is on the south side of Harrington Road in Johnson City, New
York and the residence is near the road at an elevation of approximately 1,010 to
1,020 feet.  A review of the topographic map for this area shows that the Supa spring is at
an elevation of approximately 1,130 to 1,140 feet, meaning that the spring is an estimated
120 to 130 feet higher in elevation than the residence.  South of, and upslope of, the
spring are the three existing powerline towers within the NYSEG right-of-way.  The
pipeline right-of-way is farther south and upslope from the powerlines.  Elevations vary
along the powerline and pipeline corridor but, directly south of the spring, the ground
surface where the pipeline will be installed is at an elevation of approximately 1,200 feet.
At this location, the pipeline right-of-way will be 70 to 80 feet higher in elevation than
the spring.  The Supa spring is approximately 1,400 feet from the residence and the
pipeline will be an estimated 300 feet from the spring.

264.   On November 29, 2006, Millennium filed supplemental information about the
Supa's comments, contending that the well testing has not damaged the Supa water
supply system.  Millennium states that its consultant conducted a year-long hydrologic
study on the Supa property by installing 16 piezometers to monitor groundwater levels,
characterize the source of water supply, and evaluate water quality.  Initial hydrologic
evaluation activities occurred from September 27 through October 6, 2005 and included
drilling, sampling soil and rock, and installing piezometers.  Millennium states that it
drilled 10 borings along the pipeline route to depths of 10 to 20 feet, which is deeper than
the seven to eight feet anticipated for the excavated depth of the pipeline trench, and three
borings upslope from the Supa spring and downslope from the pipeline trench.

---

[140] 100 FERC at P 210.

Docket No. CP98-150-006, et al.                                                    - 81 -

265.    After the borings were drilled, Millennium installed piezometers. Two piezometers were installed in borings 10, 11, and 12. The tops of the borings were filled with concrete and protective steel casings with lockable caps. The piezometers were removed between October 23 and October 27, 2006, at the conclusion of the test period. The borings were plugged by removing the concrete and protective casing, followed by grouting with a bentonite slurry.

266.    Millennium asserts that the Supas reported two instances where their cistern water was cloudy. The first was in October 2005 when the Supa's reported sediment in the cistern. Millennium contends that this coincided with several days of steady rainfall that began on October 7, 2005 and ended a three or four month drought. Millennium states that it recommended to the Supas that the cistern be flushed. Millennium asserts that Mr. Supa flushed the cistern on two consecutive days and reported to Millennium that the water cleared and that the sediment in the system was removed.

267.    Millennium states that the second instance occurred in early 2006, following record-breaking rainfall that caused flooding in central and eastern New York. The Supas contacted Millennium to report that sediment was again in the cistern and that the cistern was making unusual gurgling noises. Millennium contends that members of its team went on site to assess the problem a few days later, but that there was no longer any sediment and the gurgling noises had ceased. Millennium believes these instances are the result of the extremely high rainfall.

268.    Millennium also commented about the presence of petroleum hydrocarbons that were found in well number one on January 12, 2006. Millennium states that prior to that time, no hydrocarbons had been detected. Soil samples did not show any hydrocarbon and there was no evidence of any hydrocarbons during the installation of the piezometers. Millennium states that during the readings taken on January 12, 2006, a hydrocarbon coating was observed on the water level probe when it was removed, together with an odor of hydrocarbon, and a sheen was found on the water sample, as well as some product globules within the water sample. Millennium contends that it analyzed this water sample and found it to be diesel fuel. Millennium has not commented about possible sources of the diesel fuel. Millennium states that it hand delivered the results of the analysis to Ms. Supa on February 15, 2006. When piezometer one was removed on October 27, 2006, Millennium's consultant conducted a routine health and safety meeting with the Supas prior to its removal to address the considerations associated with diesel fuel. All personal protective equipment worn by on-site personnel was worn in accordance with standard safety requirements outlined in site-specific health and safety plans. Millennium states that this was done as a precautionary measure, not because there was any evidence suggesting the presence of any significant quantity of hydrocarbons.