Docket No. CP98-150-006, et al.                                    - 82 -

269.   Millennium's November 29, 2006 supplemental filing did not indicate whether
diesel fuel or any other product was observed prior to or after the instance reported on
January 12, 2006.  Further, Millennium does not indicate possible sources for the diesel
fuel.  For these reasons, we will require Millennium to report to the Commission the
potential sources for the diesel fuel observed on January 12, 2006 and whether there was
any further evidence of diesel fuel after the January 12, 2006 occurrence.  Thus, we will
add environmental condition 55 to this order, which states that:

> Prior to construction, Millennium shall file with the Secretary of the
> Commission (Secretary), for review and written approval of the Director of
> the Office of Energy Projects (OEP), a report about the diesel fuel observed
> on the Supa property in test boring one on January 12, 2006.  The report
> shall provide information about potential sources of diesel fuel and shall
> address whether further evidence of diesel fuel was observed during any
> subsequent instances of monitoring the test borings.  The report shall also
> address the issue of the need for clean up and a plan for clean up.

270.   Millennium's report about the potential impact of project construction on the
Supa's water system is pending.  Millennium asserts that when the report is completed, it
will file the report as required with the Commission for review and written approval.
Further, Millennium contends that it will file a site-specific construction plan for crossing
the Supa property, giving consideration to alternative construction methods in a manner
consistent with environmental condition 23 in this order.

271.   If the Supa's water system was damaged by well testing, Millennium states that it
will make appropriate repairs.  Millennium also states that it will implement
environmental condition 23 of this order, which requires it to file a site-specific plan for
construction and restoration of affected areas on the Supa property and to consider
alternative construction methods, such as stove-pipe construction and limits to access
across the Supa property to further mitigate construction impact.  Further, consistent with
environmental condition 58.e. of the Interim Order, if the hydrologic study shows that the
pipeline trench will convey water away from the spring, Millennium must develop
engineering and other mitigation measures, or both (including a re-route upslope from the
proposed pipeline route to avoid the water table), to maintain uninterrupted flow to the
spring and cistern.  Since Millennium has already agreed to make repairs to the Supa's
water system if repairs are needed and since Millennium's report about the Supa's water
supply is pending, we do not believe that additional environmental conditions are
required at this time.

Docket No. CP98-150-006, et al.                                    - 83 -

### 5.    Surface Water

272.   The effect of the NE-07 project on surface waters will be mainly associated with pipeline construction.  Construction of aboveground facilities will not directly affect surface waters.  The applicants propose to use appropriate erosion and sediment controls and SPCC Plans to minimize and control runoff from areas disturbed by construction.  The applicants will restore all construction workspaces after construction.  The draft supplemental EIS finds that operation of the NE-07 project facilities will have minimal impact on surface water.

273.   Millennium's construction will affect 556 waterbodies (including waterbodies crossed by access roads and located adjacent to workspaces), of which 500 will be crossed by pipeline construction using dry crossing techniques (e.g., dam and flume, HDD, or dry ditch).  This includes all of the intermittent streams and all but three of the perennial waterbodies.  An additional 53 streams will be crossed by access roads or will be adjacent to the project.  The pipeline crossings of Owego Creek and Nanticoke Creek will be in areas where there has been severe erosion, which may require restorative work outside construction workspaces.  Millennium filed site specific plans addressing how these areas will be restored after construction.  Millennium proposes to cross Wallkill River by a dam and flume, but if water flow is too high, it may use an HDD as a contingency plan.

274.   Due to the potential presence of federally endangered Indiana bats in some parts of its project area, Millennium will conduct tree clearing between October 1 and March 30.  Millennium will install equipment bridges across waterbodies to facilitate this activity.  The NYSDEC informed us that it may require a variance from the section 401 Water Quality Certificate for this activity, since this timing will conflict with the waterbody construction timing window.[141]  Environmental condition 25 requires Millennium to provide, prior to construction, the milepost locations of the waterbodies that will be included in the section 401 variance request.

275.   The NYSDEC requested that Millennium investigate the feasibility of crossing Catharine Creek by HDD.  The NYSDEC identified Catharine Creek as the highest quality trout stream in western New York and that, along with the NYSDEC-regulated

---

[141]  The construction timing windows for coldwater fisheries are from June 1 through September 15 and coolwater and warmwater fisheries are from June 1 through November 30.

Docket No. CP98-150-006, et al.                                                    - 84 -

wetland, is the most sensitive location on the west end of Millennium's project.[142] We believe that Millennium's site specific plans to cross Catharine Creek by HDD are reasonable. Environmental condition 24 requires Millennium to file a plan when an HDD crossing is unsuccessful for review and written approval prior to use of the alternative crossing method, if needed.

276.   The National Park Service, Upper Delaware Scenic and Recreational River (NPS) is concerned about project impacts on the Delaware River and the cumulative impact of multiple waterbody crossings within its drainage basin. Environmental condition 26 requires Millennium keep the NPS informed about the schedule for crossing waterbodies within this area and to update the progress of construction within the Delaware River drainage basin.

277.   As a result of detailed engineering and constructability reviews made subsequent to issuance of the final EIS for Millennium's original proposals and our draft supplemental EIS, Millennium proposes to change crossing methods for 231 waterbodies. Most of the changes involve the substitution of a type of dry-ditch crossing method, rather than the method identified previously. Only a few of the changes in the construction methodology were substantive in nature. Millennium also consulted with the NYSDEC, COE, FWS, The Nature Conservatory, and Trout Unlimited regarding the crossing methods for the larger or more sensitive waterbodies to develop the most appropriate crossing method that will have a high degree of successful completion. On July 31, 2006, Millennium filed site specific plans for crossing several of these waterbodies. We addressed the use of these plans in the final supplemental EIS and concluded that the plan's use is reasonable. Because the NYSDEC and COE have been consulted and requested these changes, we expect that they will approve the plans as part of their permitting processes.

278.   EPI's construction will cross 111 waterbodies, including 50 perennial waterbodies, of which 48 will be crossed using dry crossing techniques. EPI will cross 61 intermittent waterbodies during no flow periods or will employ dry crossing methods. An additional five waterbodies will be crossed by access roads. At the request of the NYSDEC, EPI is conducting engineering analyses concerning the feasibility of crossing Ganargua Creek by HDD and examining proposed crossings of the Canandaigua outlet and Keuka Lake outlet by HDD, but has not yet completed its engineering review. EPI is also investigating the feasibility of crossing Shequaga Creek with a bore. Environmental conditions 32 and 33 require that EPI complete these analyses and file site specific plans

--------

[142]  The COE concurs with the NYSDEC's request.

Docket No. CP98-150-006, et al.                                    - 85 -

for the crossings prior to construction. The pipeline crossings at Glen Creek and Townsend Creek are known to be areas where there has been severe erosion, which may require restorative work outside construction workspaces. Environmental conditions 34 and 35 require EPI to develop plans addressing how these areas would be restored after construction and to file the plans for this work prior to construction.

279.    Algonquin's pipeline replacement project will cross 10 surface waters, of which one (Mahwah River) is perennial. Algonquin filed a site-specific crossing plan for the Mahwah River and associated wetlands. The meandering Mahwah River has moved over Algonquin's two pipelines within the permanent right-of-way. Algonquin has requested approval from the Commission, COE, and NYSDEC to permanently relocate a section of the Mahwah River channel by about 30 feet to the south to prevent scour over the pipelines. Algonquin contends that this will facilitate construction, minimize construction impacts to the river, and allow Algonquin to restore and maintain cover over the two pipelines in the future. We believe that Algonquin's plan is acceptable, since it addresses the issue of constructing its pipeline at this location and anticipates the possibility of continued meandering of the Mahwah River channel which may affect pipeline operation in the future. However, Algonquin must receive approval from the COE and NYSDEC for this modification. Those decisions are pending.

280.    Algonquin requested variances from sections V.B.2.a. and VI.B.1.a. of the Procedures so that it may place extra workspaces within the 50-foot-wide setback from waterbodies and wetlands. Algonquin provided specific locations where it will use the variances. Environmental condition 43 approves the request at the identified locations only and requires Algonquin to file, prior to construction, site specific plans showing all construction workspaces where the variance is used.

281.    In its November 15, 2006 comment letter, the DOI recommends that the applicants survey waterbody contours prior to clearing and construction in order to ensure that streams are restored to a stable pattern, profile, and dimensions. The DOI asserts that the applicants should restore contours of temporarily disturbed waterbodies to as close to pre-construction conditions as practicable.

282.    We will require the applicants to restore waterbodies to pre-construction conditions in a manner that is consistent with section V.C. of the Procedures. This includes stabilizing the stream banks and restoring the waterbody to as close as practicable to the pre-construction contour. The applicants' environmental construction measures (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) include measures consistent with section V.C. of the Procedures.

Docket No. CP98-150-006, et al.                                     - 86 -

6.     **Wetlands**

283.    According to field delineations and reviews of national wetland inventory maps, the NE-07 project facilities will cross approximately 674 wetlands (a crossing length of 28.2 miles), affecting an estimated 185.6 acres during construction. Included in this total will be approximately 30 crossings of NYSDEC-regulated freshwater wetlands (a total crossing length of 3.1 miles), affecting about 25.7 acres during construction. Construction of the aboveground facilities for the NE-07 project components will convert a total of 0.1 acre of wetland to developed land. In addition, Millennium will permanently fill 13 small wetlands within its permanent right-of-way, impacting 0.26 acre of wetland.

284.    The primary effect on wetlands from pipeline construction will be the temporary and permanent conversion of palustrine forested wetlands (PFO) to non-forested wetland within the pipeline right-of-way and other temporary workspaces. The applicants will clear approximately 31.7 acres of PFO (including mixed PFO and other wetland types), of which approximately 21.3 acres will be permanently converted to palustrine emergent marsh wetlands and scrub shrub wetlands within the permanent right-of-way. The remaining 10.4 acres of PFO will be allowed to revert to forested wetland, representing a long-term impact as it will take over 25 years to re-establish forest vegetation. The applicants minimized potential impacts on PFO by routing the pipeline facilities within or adjacent to existing cleared rights-of-way for a significant percentage of the project's total length. Generally, following an existing right of way corridor through forested areas is preferable to establishing a new corridor, since a portion of the cleared corridor can be used for some of the construction and permanent right-of-way. Further, the COE required Millennium, EPI, and Algonquin to develop wetland mitigation plans that address compensation for the loss of permanent forested wetlands and for restoration of forested wetlands affected by clearing temporary workspaces.

285.    On December 4, 2006, in response to an October 13, 2006 site visit to the 4.8-mile-long pipeline right-of-way in Rockland County, Algonquin filed supplemental information, including correspondence with the COE and NYSDEC, regarding wetland impacts. Based on agency consultation, Algonquin proposes to reduce the size of additional temporary workspaces to eliminate impacts to forested wetlands in wetlands 02, 03, 04, and 07. However, depending on the final plan for the crossing of these waterbodies, forested wetland impacts will not be completely eliminated in wetland 01 or during the crossing of the Mahwah River. Algonquin indicates that it has not finalized the plan for crossing the Mahwah River, since it is still negotiating with the affected landowner. Since this plan may differ from the plan filed with the Commission, we will add environmental condition 56 to this order:

Prior to construction, Algonquin shall file with the Secretary, for review and written approval of the Director of OEP, the final site-specific plan for crossing the Mahwah River developed in consultation with the COE, NYSDEC, and the affected landowner(s).

286.   Further, Algonquin contends that it eliminated impacts for forested wetlands at the Oxford compressor station. Originally, construction would have impacted an estimated 0.5 acre of forested wetland associated with wetland 01 at this site. Algonquin modified its workspace requirements to eliminate this impact.

287.   There will be minimal, short-term effects on palustrine emergent marsh wetlands and scrub shrub wetlands within temporary workspaces and the permanent right-of-way, as these areas will be allowed to revegetate naturally and will be restored in vegetative cover similar to that found prior to construction. If seeding is used in wetland areas, the seed mix will contain native plant species. Consistent with section VI.C.4 of the Plan, wetland restoration plans will include measures for re-establishing herbaceous and/or woody species, controlling the invasion and spread of undesirable exotic species (e.g., purple loosestrife and phragmites), and monitoring the success of the revegetation and weed control efforts. The success of restoration will be monitored for at least three years. If revegetation is not successful at the end of three years, the applicants will need to develop and implement (in consultation with a professional wetland ecologist, the COE, or the NYSDEC, as appropriate) a remedial plan to actively revegetate the wetland.

288.   We understand that the COE may require wetland mitigation and compensation for loss of forested wetlands as part of the permit the COE will issue to the applicants. Environmental conditions 37 and 46 require that EPI and Algonquin, respectively, consult with the COE about wetland mitigation and compensation, consistent with the preliminary plans proposed by Millennium, and file the final version of the wetland mitigation and compensation plans with the Secretary. Millennium already agreed to do this.

289.   In its November 15, 2006 comment letter, the DOI recommends that the applicants survey wetland contours prior to clearing and construction in order to ensure that the wetlands are restored to pre-disturbance hydrological conditions. The DOI contends that all wetlands should be delineated prior to construction.

290.   The applicants will delineate wetlands prior to construction in a manner consistent with section VI.A.1 of the Procedures. The applicants will restore wetlands consistent with section VI.C of the Procedures following construction, which also indicates that wetland hydrology should be maintained. Section VI.B.2.a. requires the applicants to comply with COE permit terms and conditions. Further, the adequacy of the restoration

of wetland hydrology is reflected in the success of wetland revegetation, which will be monitored for at least three years after construction. We believe that impacts on wetlands will be minimized, if the NE-07 project is constructed in accordance with the construction and restoration measures identified by each applicant in its environmental construction plan (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plan, as supplemented with the COE-approved mitigation plans and the environmental conditions contained in this order.

### 7.    <u>Vegetation and Wildlife</u>

291.    The construction and operation of the NE-07 project will result in the temporary and permanent alteration of wildlife habitat and have a direct impact on wildlife through disturbance, displacement, and mortality. The clearing of forest for construction and operation of the pipeline and aboveground facilities will result in a change of forested wildlife habitats to herbaceous and shrub habitat types. Construction of the project will permanently affect approximately 439.4 acres of upland forest within the permanent right-of-way and approximately 14.0 acres of forest within aboveground facility sites. After construction, the temporary construction right of way and extra work areas in previously forested areas will be allowed to revegetate naturally and will eventually return to pre-construction conditions.

292.    Within the permanent right-of-way, the applicants will convert forested areas from forest habitat to herbaceous and shrub cover for the operation of the pipeline facilities. Specifically, Millennium will convert approximately 367.8 acres, EPI will convert approximately 81.0 acres, Algonquin will convert approximately 5.2 acres, and Iroquois will convert approximately 2.9 acres.

293.    The New York Natural Heritage Program (NYNHP) identified nine significant natural communities near Millennium's proposed facilities, including the Line A-5 replacement project within Harriman State Park. Millennium's construction plans in these areas were developed with the PIPC to minimize impacts to park resources and are described in the EM&C Plan for Harriman State Park. The NYNHP has not yet responded about potential significant natural communities near Iroquois' Dover compressor station. However, since this is an existing compressor station and the new facilities will be constructed in maintained spaces within and adjacent to the existing facility, we do not anticipate impact to significant natural communities in that area.

294.    The Algonquin pipeline replacement component of the project, the Ramapo station, the Stony Point compressor station, and the Hudson River valve site are in the New York-New Jersey Highlands, an area designated by New York as a Significant Habitat Complex of the New York Bight Watershed. However, all activities and

facilities that will be constructed within the New York-New Jersey Highlands will occur along existing rights-of-way or at existing aboveground facilities. Thus, we do not anticipate any significant impacts to the wildlife of this significant habitat complex as a result of the project.

295.    We believe that potential impacts on wildlife have been reduced to a level that is not significantly adverse, due to the routing of the pipeline facilities within or adjacent to existing cleared rights-of-way and the adoption of restoration procedures that will promote revegetation of temporary work areas to approximate pre-construction habitat conditions. In addition, vegetation maintenance procedures during operation of the NE-07 project components include limitations on the timing and frequency of mowing and other activities to maximize opportunities for general wildlife and avian species to use the habitat, while allowing for operation of the pipeline and aboveground facilities.

### 8.    Fisheries

296.    The final EIS for the original Millennium project included a description of potential impacts to fisheries. Millennium's proposed route modifications herein, including the NYSEG and Warwick Isle route variations, will not affect the previously reported scope of potential fishery impacts or the mitigation measures proposed by Millennium or required by the Commission in its Interim Order and the 2002 *Millennium* Order.

297.    In regard to the Neversink River, Millennium now proposes to use a 7.1-mile-long segment of Columbia's existing 24-inch diameter Line A-5 pipeline for the river crossing, rather than attempting a crossing of the Neversink River, as originally proposed. This will avoid any impacts to fisheries or other aquatic resources in the Neversink River. Most of the streams in the Columbia Line A-5 replacement portion of the project are identified by the NYSDEC as coolwater or warmwater fishery streams, while the Ramapo River and Stony Brook are classified as coldwater fishery streams. The two Ramapo River channels will be crossed using the HDD crossing method and Stony Brook will be crossed using a dry crossing method.

298.    EPI's construction will cross 47 perennial streams classified as warmwater fisheries and three coldwater fisheries. Algonquin's pipeline replacement project will cross the Mahwah River, which supports both warmwater and coldwater fisheries, and an additional nine intermittent waterbodies that support only warmwater fisheries. There will be no impact on fisheries due to construction or operation of Iroquois' facilities.

299.    The construction impacts to fishery resources will include temporary habitat alteration and substrate disturbance at the site of the pipeline installation across

waterbodies. In addition, some invertebrates will likely be lost at the immediate waterbody crossings. The applicants propose a waterbody crossing method for each waterbody crossing. The COE and the applicable state permitting agencies are reviewing these proposals as part of the required federal and state permitting processes. The use of HDDs and dry-ditch crossing methods will reduce or eliminate downstream turbidity and sedimentation resulting from construction activities. When successful, HDD crossings will have no in-stream and fisheries impacts. Dry crossing techniques and the use of specified construction timing windows will minimize impact on water quality and will avoid interruption of spawning runs at waterbodies. The operation and routine maintenance of the project facilities will not adversely affect fishery resources.

300.    We believe that implementing the Procedures, as well as the measures identified by each applicant in their environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plans, will minimize impacts on fisheries resources.

## 9.    Endangered and Threatened Species

301.    To comply with the requirements of section 7 of the Endangered Species Act, we conducted informal consultation with the FWS and the NMFS regarding the presence of federally-listed or proposed endangered or threatened species and their critical habitats in the project areas. A total of six federally listed endangered or threatened species were considered as potentially occurring in the vicinity of the project facilities. The species include the endangered Indiana bat, shortnose sturgeon, and dwarf wedge mussel. The threatened species include the bald eagle, bog turtle, and Leedy's roseroot. The final Biological Assessment for the NE-07 project is in the final supplemental EIS.

302.    The FWS indicated that suitable summer habitat for the Indiana bat might be present in the vicinity of the NE-07 project. At the request of the FWS, Millennium conducted field surveys in 2005 to assess potential effects of the project on the Indiana bat in Orange and Rockland Counties. Millennium captured fifteen Indiana bats during mist netting surveys including reproductive adult females, adult males, and juveniles. Radiotelemetry studies on the bats captured by Millennium identified 11 roosts, including maternity roosts, in nearby habitat outside the project construction areas. No known bat roosts exist within the project right-of-way. However, Millennium will remove some potential Indiana bat roosting habitat during construction. Considering that the pipeline is a linear project and will be constructed along an existing cleared right-of-way, we estimate this impact to be an insignificant portion of the overall suitable habitat available in the vicinity of the project. We determined that Millennium's proposals may affect, but is not likely to adversely affect, the Indiana bat if tree clearing for construction is limited to the period between October 1 and March 30. This is the only period in which

Docket No. CP98-150-006, et al.                                                    - 91 -

Millennium may clear trees or conduct future maintenance activities which might require tree pruning or clearing.[143]  If Millennium must clear trees outside this construction window, it should employ the services of a qualified bat scientist to investigate trees or conduct other surveys, as may be recommended by the FWS, for the presence of Indiana bats, or both, to avoid a take of bats.[144]

303.    A known Indiana bat hibernaculum exists within six miles of Algonquin's Hanover compressor station in Morris County, New Jersey.  Suitable habitat may occur near Algonquin's Stony Point compressor station and the pipeline replacement project in Rockland County and the Southeast compressor station in Putnam County.  Limited clearing of suitable summer roosting, maternity, and foraging trees in these project areas could affect the Indiana bat if it occurs during bat activity periods.  Algonquin completed field surveys of the project locations identified as potential habitat in May and August of 2006.  Based on the executive summary of a report filed by Algonquin on July 31, 2006, no Indiana bats were found.  On September 26, 2006, Algonquin filed a report entitled, *"2006 Summer Mist Net Survey for the Federally-Endangered Indiana Bat on the Algonquin Ramapo Expansion Project."*[145]  Algonquin states that it captured 227 bats representing six species, but none of the captured bats were from a federally threatened or endangered species, and no Indiana bats were captured in any project area.

304.    On December 4, 2006, Algonquin filed supplemental information about Indiana bats and the Hanover compressor station.  Algonquin asserts that subsequent to filing its survey report, the New Jersey field office of the FWS informed Algonquin that an individual immature Indiana bat had been documented during a separate mist survey at the adjacent Morristown Municipal Airport.  Algonquin consulted with the FWS during a site visit to the Hanover compressor station.  As a result of this consultation, Algonquin proposes to incorporate additional conservation measures into the site construction plan to reduce the amount of upland forest that will be cleared at this location, reducing the impact on potential roosting habitat for Indiana bats.  Originally, Algonquin estimated that about 7.83 acres of upland forest would be cleared for construction, but it has reconfigured its workspace and reduced the amount of forest clearing to about 2.16 acres.  Algonquin states that it will identify and flag potential roost trees prior to clearing

---

[143] *See* environmental condition 27.

[144] The FWS' comments about impacts on Indiana bats along Millennium's portion of the project are pending.

[145] This document was not available prior to sending the final supplemental EIS to the printer.

Docket No. CP98-150-006, et al.                                                - 92 -

activities to avoid and preserve these trees. This will occur in areas close to proposed staging areas in the northwest portion of the property and along the gravel access road from Park Avenue eastward along the fence line of the existing compressor station site. Further, Algonquin contends that it will limit tree clearing to the October 1 through March 30 timing window.

305.    Algonquin's reduction in land requirements in upland forest at the Hanover compressor station will minimize impacts on potential Indiana bat roosting trees and its commitment to conduct tree clearing only during the timing window at this location will avoid direct impacts to Indiana bats that might be using the trees for roosting during other time periods. While preliminary results indicate that no Indiana bats were found in other project areas, potential Indiana bat habitat may be affected by construction. For this reason, environmental condition 44 which requires Algonquin to clear trees in the areas surveyed for Indiana bats only between October 1 and March 30, pending comment by the FWS, should remain unchanged.[146]

306.    The FWS commented that impacts to the Indiana bat will be unlikely in EPI's project areas, since Indiana bat habitat does not appear to be within the vicinity of EPI's project components. We concur with this conclusion.

307.    The NYSDEC determined that the shortnose sturgeon potentially occurs in the vicinity of Algonquin's Hudson River valve site. However, the modifications to the Hudson River valve site will not involve any in-water activities in the Hudson River, nor will any of the project components result in any temporary or permanent disturbances to the Hudson River. Algonquin initially proposed using the Hudson River as the source for hydrostatic test water, which means it would place intake hoses into the river. The COE commented that intake hoses installed in navigable waters may be a section 10 regulated activity and there may be an unknown impact on the federally endangered shortnose sturgeon. Subsequently, Algonquin stated that it will not use the Hudson River as a supply source for hydrostatic test water and that it will find an alternative water supply source.

308.    The original Millennium project involved construction across the Haverstraw Bay portion of the Hudson River affecting shortnose sturgeon. Since the NE-07 project will not involve any construction in the bay, in a September 19, 2006 letter, the NMFS concurs with our determination that this project is not likely to adversely affect any listed

--------------------------------------------------

[146] The FWS' comments about impacts on Indiana bats along Algonquin's portion of the project are pending.

Docket No. CP98-150-006, et al.                                          - 93 -

species under its jurisdiction, including the shortnose sturgeon. Further, because of the change to the project since it was proposed, the NMFS states that the September 14, 2001 Biological Opinion it issued for the original Millennium project is invalid. Due to this letter, our consultation with the NMFS concluded.

309.    The dwarf wedge mussel occurs in the Neversink River in Orange County. Millennium does not propose to replace a segment of Columbia's existing 24-inch diameter Line A-5 pipeline that crosses the Neversink River in order to avoid any construction in the vicinity of the river. Based on this proposed alternative, we concluded that the Millennium's proposal will not adversely impact the dwarf wedge mussel.[147]

310.    The NYNHP indicated that Millennium's project will cross five known bald eagle nesting or wintering areas. Based on the NYSDEC's statements in the final EIS for Millennium's original proposals, no adverse affects on bald eagles are expected at four of those activity areas, because there are no known nests within a half mile of the project and the closest known nest is about 3,000 feet from the project. The NYSDEC requested that there be no construction in areas adjacent to the Mongaup River/Rio Reservoir area between December 1 and July 31 to avoid the nesting and overwintering periods in this bald eagle activity area. Millennium and the FWS agreed to construct the crossing of the Mongaup River between October 15 and November 30.

311.    There may be limited impact on eagles, if blasting is required in designated bald eagle activity areas that are used for nesting and winter habitats near the Mongaup River/Rio Reservoir near MP 330.0. Thus, environmental condition 29 requires Millennium to consult with FWS and the NYSDEC to develop a bald eagle activity area construction plan to address blasting in activity areas. Further, environmental condition 30 requires Millennium to consult with the NYSDEC and FWS at least one month prior to the start of construction to get an update on any additional nests that may have been found in the project area. With implementation of our recommended mitigation, we conclude that the proposed action would not adversely affect or jeopardize the continued existence of the bald eagle.[148]

312.    The FWS indicated that the bog turtle is known to occur in the vicinity of Millennium's proposed construction in Orange County and requested that a Phase I Habitat Assessment survey be conducted to determine if suitable habitat existed for the

---

[147] FWS' comments on the impact to the dwarf wedge mussel are pending.

[148] FWS' comments on the impact to the bald eagle are pending.

Docket No. CP98-150-006, et al.                                            - 94 -

species. Millennium conducted its Phase I bog turtle habitat surveys in the spring and fall
of 2005 and in April and May 2006. Of the 96 wetlands surveyed in 2005 and 2006,
three wetlands contain potential bog turtle habitat. One wetland exhibits suitable habitat
within two breached manmade ponds. The landowner may rebuild the ponds. If this
occurs, the wetland would no longer offer suitable habitat for the species. Also, this
wetland is in an area of Orange County where no known bog turtle populations occur and
that is lacking suitable surrounding habitat. Thus, the site is likely temporary and it is
unlikely to contain bog turtles. The second wetland may contain suitable bog turtle
habitat, but the vegetation consists primarily of the common reed (*Phragmites australis*),
an invasive plant species, whose habitat is not used by the bog turtle due to the lack of
basking and nesting habitat. In addition, this wetland is located near the summit of
Pound Mountain, an area that is likely inaccessible to the species due to steep slopes and
rough, rocky terrain. For this reason, the site is unlikely to contain bog turtles. The third
wetland with suitable bog turtle habitat is adjacent to the project construction area and is
separated from the right-of-way by a rock wall. Environmental condition 28 requires
Millennium to install turtle exclusion fencing during the bog turtle window of activity
(April 15 to October 31) along the wetland identified as potential bog turtle habitat, to
employ a bog turtle monitor to be on hand when construction coincides with the bog
turtle window of activity, to conduct a daily pre-construction survey of the project site,
and to provide daily monitoring and relocation of bog turtles to suitable habitat outside
the construction area when necessary. If this mitigation is used during construction, we
conclude that the bog turtle is unlikely to be adversely affected by construction of
Millennium's project.

313.    Algonquin conducted a Phase I Habitat Assessment survey of all areas of
potentially suitable bog turtle habitat at the pipeline replacement corridor, Stony Point
compressor station, Southeast compressor station, and Oxford compressor station project
areas. Algonquin found no suitable habitat at the Oxford compressor station site, some
marginal wetland habitat along the pipeline replacement corridor and near the Southeast
compressor station, and marginal bog turtle habitat was located both on and adjacent to
the Stony Point compressor station. In a January 11, 2006 letter, the FWS concurred with
the survey findings for the Oxford compressor station site.[149] Due to the marginal nature
of the habitat at the Southeast compressor station and the pipeline replacement area, it
may be unlikely that the project will adversely impact the bog turtle at these sites. No
wetlands will be directly impacted or disturbed during construction and modifications to
the Stony Point or Southeast compressor station. Nevertheless, due to the fact that

---

[149] FWS' comments on the impact of Algonquin's project on bog turtles at other
locations are pending.

possible habitat was found nearby, Algonquin proposed bog turtle avoidance measures for these two compressor stations. In these measures, Algonquin agreed to install turtle exclusion fencing and to assign a biological monitor to survey for the presence of turtles prior to and during the initial clearing and site preparation required for the staging areas. The biological monitor will inspect the sites periodically during the construction phase of the project to provide oversight for the construction crews, as needed. For these reasons, we conclude that construction and operation of Algonquin's proposals will not adversely affect the bog turtle.

314. In October 2001, Iroquois conducted field surveys for bog turtles at the Dover compressor station and located potential bog turtle wetland habitat. However, the construction workspace would be at least 300 feet away from the wetland. Thus, we find that Iroquois' proposals will be unlikely to adversely affect the bog turtle.[150]

315. The FWS indicated that Leedy's roseroot occurs along the face of shale cliffs approximately two miles from portions of EPI's proposed construction. Nevertheless, the FWS believes that the proposed work will not adversely affect Leedy's roseroot, provided that the project activities avoid disturbance of any adjacent cliff vegetation. Because no cliff areas were observed at EPI's project areas and no disturbance of suitable cliff vegetation will occur, we conclude that Leedy's roseroot is unlikely to be adversely impacted by EPI's proposals.

316. On July 31, 2006, Millennium filed a minor route variation to avoid impacts to one identified timber rattlesnake den and its associated habitat, stating that it will implement the previously agreed-to avoidance and mitigation measures for rattlesnake den sites. Millennium developed this route variation in consultation with the NYSDEC to minimize impacts on this New York state-listed threatened species. In addition, a NYSDEC rattlesnake expert will assess the site to determine if further avoidance measures may be necessary. Algonquin states that it will have a rattlesnake monitor on hand during construction of various components of its project as recommended by the NYSDEC.

#### 10.    Land Use

317. Generally, Millennium's and EPI's pipelines will be installed within a 75-foot-wide right-of-way, of which 50 feet will be maintained for operation. The Algonquin pipeline replacement project will use a 100-foot-wide construction right-of-way, which

---

[150] The FWS comments on the impact of Iroquois' project in New York are pending.

Docket No. CP98-150-006, et al.                                      - 96 -

includes an existing 75-foot-wide permanent easement for operation. The construction of the applicants' pipelines and aboveground facilities will directly disturb approximately 3,461.1 acres of land for the construction rights-of-way, extra work areas, and aboveground facilities. Following construction, the applicants will retain 1,683.5 acres of permanent right-of-way for operation of the pipelines and associated aboveground facilities.

318.    The applicants will construct approximately 212.3 miles of pipeline adjacent to or within existing rights-of-way. The remaining 52.2 miles of pipeline will be constructed on new rights-of-way. The new right-of-way segments will be distributed throughout the length of the NE-07 project and will be incorporated into the proposed route because of topography, engineering, or residential constraints.

## 11.    Residential Areas

319.    There are approximately 173 residential structures within 50 feet of the construction work areas. The Sterling Forest State Park/Laurel Ridge alternative will avoid five of these residences. The Warwick Isle route variation and the Ramapo River HDD variation will avoid planned residential communities. Each applicant will implement mitigation measures contained in its environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) during construction in residential areas or will use the Plan (Iroquois). These measures will include fencing the construction work area, preserving mature trees and landscaping, reducing the construction work areas as necessary to maintain 25 feet between the residence and the work area (where feasible), using drag section or sewer line construction techniques to install the pipeline, and restoring residential properties immediately after backfilling the trench. Environmental condition 13 requires Millennium, EPI, and Algonquin to update the list of residences within 50 feet of the construction right-of-way prior to construction. Environmental condition 14 requires Millennium, EPI, and Algonquin to file site specific plans for construction within 25 feet of any residence. We find that use of the mitigation measures in the environmental construction plans will minimize temporary impacts due to construction, when construction activities are near residences.

## 12.    Recreation and Public Interest Areas

320.    Millennium's pipeline will cross Soaring Eagle/Mark Twain State Park, Sterling Forest State Park, Harriman Forest State Park, Kakiat County Park, and the Appalachian

Docket No. CP98-150-006, et al.                                          - 97 -

Trail.[151] The pipeline will also cross campgrounds, church grounds, and private shooting ranges. After the draft supplemental EIS was issued, the Harwood Club filed comments opposing the project, since the project might affect the use of its properties in Orange and Sullivan Counties for hunting, fishing, and other recreation. The final supplemental EIS addressed the Harwood Club's questions about pipeline construction and impacts on wildlife. Also, Millennium states that it will work with recreational property owners, which includes the Harwood Club, to minimize impacts to recreational use of property. We conclude that there will be minimal impact on recreation and public interest areas due to effective routing, use of existing corridors, minimizing width of construction rights-of-way, timing of construction activities based on consultations with the appropriate local government and owner representatives, and post-construction restoration. Millennium will use the EM&CP it developed in consultation with the PIPC to mitigate environmental impacts due to construction in Sterling Forest State Park and Harriman Forest State Park.

321.    Algonquin will consult with the PIPC about construction in Harriman State Park and with the Rockland County Division of Environmental Resources about construction in Kakiat County Park. Environmental condition 48 requires Algonquin to file the results of this consultation with the Secretary prior to construction.

## 13.    Coastal Zone Management Consistency

322.    The construction areas for Algonquin's Hudson River valve site modification will be within New York's Coastal Zone Management Boundary. The NYSDOS determined that Algonquin's project meets its general consistency concurrence criteria and that no further review of the proposed activity will be required.[152] No other project construction would affect coastal zone areas.

## 14.    Visual Resources

323.    Approximately 212.3 miles (80 percent) of the proposed pipeline construction will be adjacent to existing rights of way or in roads, reducing the need to establish new utility corridors. The expansion of existing corridors may result in visual impacts, particularly in areas where existing vegetation provides screening of powerline rights-of-way from

---

[151] We addressed the crossing of the Appalachian Trail in the final EIS for Millennium's original proposals. That discussion is incorporated by reference.

[152] NYSDOS' General Concurrence was dated March 15, 2006.

Docket No. CP98-150-006, et al.                                                    - 98 -

nearby residences. To mitigate for this visual impact, the applicants will minimize clearing of trees and vegetation that provide important visual screening of an existing right of way from adjacent residences. Where screening must be removed for safety considerations, the applicants will plant fast growing trees or shrubs within temporary work areas between a residence and an existing right-of-way.

324.   Aboveground facilities will result in various visual impacts. Millennium will construct its Corning compressor station adjacent to an existing compressor station that is already a dominant visual element. The modifications to Algonquin's existing compressor station sites will not significantly change visual impacts. EPI will construct its proposed Oakfield compressor station on agricultural and open lands. The construction will change the viewshed of the residents who live nearby. This impact may be substantial to these residents, but it will be minimized and partially obscured by topography. EPI will consider additional screening to mask the facility. Algonquin will construct its proposed Oxford compressor station within an area that will be obscured from the viewsheds by forest.

325.   Iroquois' proposed construction at the Brookfield compressor station will be adjacent to existing aboveground natural gas facilities. The property and the surrounding area are also visually affected by the cleared 90-foot-wide Algonquin pipeline right-of-way, the cleared 50-foot-wide Iroquois pipeline right-of-way, a powerline right-of-way, and a railroad. The new facilities will be viewed together with these existing features. Iroquois will retain the wooded buffer along High Meadow Road and the 68.3-acre property is mainly covered with forested areas, which will be retained during operation of the facility. These forested areas will partially screen the facility. The buildings Iroquois will construct to house the new facilities and to minimize visual impact will be "barn-like" and similar in architecture to other buildings in the general area. If needed, Iroquois will also minimize lighting and develop additional landscaping.

326.   We have not identified any visual affects to State or National Register of Historic Places eligible or potentially eligible properties. Thus, no additional mitigation measures are required.

### 15.     Cultural Resources

327.   The applicants filed with the Commission and the state historic preservation offices (SHPOs) cultural resource survey reports covering approximately 245.6 miles (93 percent) of the pipeline routes and extra work areas including access roads, pipe storage/contractor yards, compression station properties, and measuring stations. Approximately 8.8 miles along the Millennium's route and 9.6 miles along EPI's route have yet to be surveyed due to denial of access. No areas remain to be surveyed for

Docket No. CP98-150-006, et al.                                                    - 99 -

Algonquin's or Iroquois' proposals. The New York and Connecticut SHPOs commented on the reports and made recommendations for additional work to several specific components of the projects. We concur with the SHPOs' recommendations. Because additional surveys and testing are still required and final determinations of eligibility and effect have not been made for this project, we anticipate executing a programmatic agreement with the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation for construction in New York. Also, we recommend that construction be deferred until cultural resource surveys, testing, and any required mitigation plans have been completed and the reports filed, along with the SHPOs' comments, as appropriate.

### 16.    Air and Noise

328.    We identified no significant short- or long-term impact on air or noise quality that will result from construction and operation of the NE-07 project. We anticipate that the project will meet all applicable federal, state, and local air quality and noise regulations. The applicants will comply with the Clean Air Act's[153] state improvement plan and the timely attainment of the national ambient air quality standards. With the implementation of the recommended mitigation measures, we find that sound levels attributable to the project will be adequate to protect human health and welfare with an adequate margin of safety.

329.    Algonquin, Millennium, EPI, and Iroquois cumulatively propose the construction of four new compressor stations, the modification and/or upgrading of four existing compressor stations, and the construction of approximately 265 miles of pipeline and related facilities. During operation, the compressor stations will emit varying quantities of criteria pollutants. However, the combustion of natural gas produces significantly lower emissions when compared to the combustion of coal or oil. One of the project's primary goals is to increase the availability and use of natural gas as opposed to other traditional fossil fuels.

330.    To address the Clean Air Act general conformity rule, we performed an applicability analysis to determine if a formal conformity determination must be completed. Since the emissions from the project construction and operation will be below the applicability threshold and will not be regionally significant, we determined that a formal conformity determination was not required.

--------------------------------------------------

[153] 42 U.S.C. § 7401-7671q.

Docket No. CP98-150-006, et al.                                                                    - 100 -

331.    Several components of the new and modified compressor stations, as well as construction associated with the project, will generate noise.  The compressor station components generating noise include, but will not be limited to:  the turbine, compressor, turbine exhaust and ducting, aboveground piping, lube oil coolers, gas after coolers, air intake systems, air handling units, and blowdown equipment.  The use of noise control measures for the compressor stations and associated equipment will be necessary to reduce the potential impact to surrounding areas and ensure compliance with federal, state, and local regulations.  Noise control measures that have been evaluated and will be incorporated where necessary include, but will not be limited to:  the use of appropriate building materials, installation of muffler systems, use of acoustical pipe insulation, and the installation of air intake and blowdown silencers.  Environmental conditions 31 (Millennium), 38 (EPI), 49 and 50 (Algonquin), and  53 and 54 (Iroquois) require that the noise levels of the new and modified compressor stations not exceed a day-night sound level (Ldn) of 55 standard A weighting curve for sound levels (dBA) at nearby noise sensitive areas (NSAs) when the stations are operated at full load.  We will require the applicants to conduct post-construction noise surveys no later than 60 days after placing the compressor stations in service.  If the surveys show that noise levels exceed an Ldn of 55 dBA at the NSAs, we will require the applicants to install additional noise controls to meet the level within one year of the in-service date of the facilities.

332.    Construction noise will be intermittent and will vary from hour to hour at any single location depending on the equipment in use and the operation being performed.  Since construction will move at about 400 feet per day, the duration of exposure to high noise levels related to construction will be limited to a relatively short period of time at any one location.

## 17.    Reliability and Safety

333.    We have not identified any unacceptable reliability or safety risks associated with the project.  Millennium, Algonquin, Iroquois, and EPI will design, construct, operate, and maintain the pipelines and aboveground facilities in accordance with the DOT's Minimum Federal Safety Standards in 49 C.F.R. Part 192.  These regulations are intended to ensure adequate protection for the public and to prevent natural gas facility accidents and failures.  Part 192 specifies material selection and qualification, design requirements, and protection from internal, external, and atmospheric corrosion.  Pipelines and compressor stations are built in areas of varying population density throughout the United States.  Because avoidance of populated areas is not always possible, the standards in the Federal regulations become more stringent as the human population density increases.  Millennium, Algonquin, Iroquois, and EPI will select contractors to construct the pipeline according to these standards and each company's individual project specific plans.  These facilities will be designed to maintain minimal

Docket No. CP98-150-006, et al.                                    - 101 -

hazard potential to the surrounding area. Thus, we find that this project does not present a substantial safety risk to the public.

334.    Ms. Supa is concerned about the safety and reliability of Columbia's Line A-5 and the line's ability to provide gas service to the Endicott and Union Center meter and regulating stations. She notes that gas pressure on Line A-5 will be lowered to 300 psi, but that this is a "feeble and unsafe" attempt to keep the aging Line A-5 in service.

335.    Ms. Supa's comments refer to the continued operation of segments of Line A-5 as laterals for delivery of gas to customers at the two meter and regulating stations. The operating pressure will be reduced since the laterals will no longer be operated as Columbia's mainline due to the construction of Millennium's pipeline. Existing service obligations will be maintained at these delivery points via these segments of the old Line A-5 pipeline, so there will be no loss of service. In its November 29, 2006 supplemental filing, Millennium contends that this pipeline segment has a maximum operating pressure of 702 psig, but that the existing market demand can be met while operating at 300 psig. Millennium also asserts that future market growth in this area may be accommodated by operating the pipeline segment at higher pressure. Since all of the pipeline facilities will be operated in compliance with the requirements for operation and maintenance under the DOT's Minimum Federal Safety Standards at 49 C.F.R. Part 192, we find that there is no safety risk to the public.

## 18.    Additional Requirements

336.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. We encourage cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[154]

337.    The applicants shall notify the Commission's environmental staff by telephone or facsimile of any noncompliance identified by other federal, state, or local agencies on the same day that they are notified. The applicants shall file written confirmation of such notification with the Secretary within 24 hours.

---

[154] *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988); *National Fuel Gas Supply v. Public Service Comm.*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

Docket No. CP98-150-006, et al.                                    - 102 -

338.    At a hearing held on December 21, 2006, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the applications, as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

    (A)  The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to acquire, construct, and operate facilities, as more fully described in the applications to amend in Docket Nos. CP98-150-006, CP98-150-007, and CP98-150-008 and the body of this order.

    (B)  The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to lease capacity from Columbia, as more fully described in the application and in the body of this.

    (C)  Millennium's motion to vacate the authorization issued in the Interim Order and the 2002 *Millennium* Order is granted.

    (D)  Millennium's proposal for regulatory asset treatment is accepted, subject to the condition that Millennium will not propose to recover any unrecovered costs under the negotiated contracts from any other non-negotiated rates customer and that Millennium will only record regulatory assets to the extent its capacity is subscribed.

    (E)  Millennium shall file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities that reflect compliance with the NAESB standards in effect at that time and the modifications discussed in this order.

    (F)  In Docket No. CP06-76-000, a certificate of public convenience and necessity is issued authorizing Algonquin to construct and operate facilities, as described more fully in this order and in the application.

    (G)  Algonquin's proposed incremental reservation rate under Rate Schedule AFT-1 is approved.

    (H)  Algonquin shall ensure that the fuel use costs for its proposal are the responsibility of the expansion shippers and Algonquin.

Docket No. CP98-150-006, et al.                                                    - 103 -

(I)  Algonquin shall file a tariff sheet consistent with its *pro forma* tariff sheet at least 60 days prior to its proposed effective date.

(J)  The certificate issued in the *Iroquois* Order is amended to permit Iroquois to construct and operate facilities, as more fully described in the application in Docket No. CP02-31-002 and the body of this order.

(K)  Iroquois' request for pre-approval of rolled-in rate treatment is granted, subject to the conditions described in the body of this order.

(L)  The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to abandon facilities, as more fully described in the applications in Docket Nos. CP98-151-003 and CP98-151-004 and in the body of this order.

(M)  The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to lease capacity from Millennium, as more fully described in the applications and in the body of this order.

(N)  Columbia's request for a limited-term certificate, with pre-granted abandonment authority on the in-service date of Millennium's system, is granted.

(O)  Columbia's request for waiver of the compliance and reporting requirements for the limited-term certificate is denied.

(P)  Columbia is prohibited from submitting a TCRA filing to recover the Account 858 costs associated with the Millennium lease until it submits an NGA section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

(Q)  Columbia shall notify the Commission within 10 days of the date of the abandonment of Line A-5.

(R)  In Docket No. CP06-5-000, a certificate of public convenience and necessity is issued authorizing EPI to construct and operate the facilities described in this order and in EPI's preliminary determination.

(S)  In Docket No. CP06-6-000, a blanket transportation certificate is issued to EPI under Subpart G of Part 284.

(T)  In Docket No. CP06-7-000, a blanket construction certificate is issued to EPI under Subpart F of Part 157.

Docket No. CP98-150-006, et al.                                   - 104 -

(U)  Empire's section 284.224 blanket certificate is terminated on the in-service date of the proposed connector facilities.

(V)  The requests for rehearing and clarification of the preliminary determination issued to EPI are granted and denied, as indicated in the body of the order.

(W)  EPI shall file any renegotiated contract containing non-conforming provisions and negotiated rate contract(s) or numbered tariff sheets at least 90 days prior to the commencement of service.

(X)  EPI shall file actual tariff sheets at least 90 days before the in-service date of its facilities that reflect compliance with NAESB standards in effect at that time and the modifications discussed in this order.

(Y)  The certificates issued in Ordering Paragraphs (A), (F), (J), and (R) are conditioned on Millennium's, Algonquin's, Iroquois', and EPI's compliance, respectively, with all of the applicable regulations under the NGA, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (d), (e), and (f) of section 157.20.

(Z) Millennium, Algonquin, Iroquois, and EPI shall file executed firm transportation contracts with their shippers prior to construction of any authorized facilities.

(AA)  Algonquin and Iroquois shall file their negotiated rate contract(s) or numbered tariff sheets as described in the body of this order at least 60 days prior to the commencement of service on their proposed facilities.  Millennium and EPI shall file not less than 90 days prior to the commencement of service.

(BB)  Millennium and EPI shall make filings within three years after their in-service date justifying their existing recourse rates or proposing alternative rates, as discussed in the body of this order for Millennium and in the preliminary determination for EPI.

(CC)  Millennium, Algonquin, Iroquois, and EPI shall maintain separate books, accounts, and records for transportation provided under their negotiated rates and for transportation provided under their recourse rates.  Algonquin shall maintain separate books and records for its incremental service.

Docket No. CP98-150-006, et al.                                    - 105 -

(DD)  Millennium's, Algonquin's, Iroquois', and EPI's facilities shall be constructed and made available for service within three years of the date of the order in this proceeding.

(EE)  The certificates issued herein are conditioned on Millennium's, EPI's, Algonquin's, and Iroquois' compliance with the environmental conditions set forth in Appendix C to this order.

(FF)  Millennium, Algonquin, Iroquois, and EPI shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies the applicants herein.  Millennium, Algonquin, Iroquois, and EPI shall file written confirmation of such notification with the Secretary within 24 hours.

(GG)  The untimely motions to intervene by the parties listed in Appendix B are granted.

(HH)  Baltimore Gas' request for a technical conference in Docket No. CP05-19-000 is denied.

(II)  Consolidated Edison's and Orange and Rockland's request for a consolidated technical conference in Docket Nos. RP06-231-002, RP06-365-000, and the NE-07 project is denied.

(JJ)  In all other respects, the Interim Order, the 2002 *Millennium* Order and the *Iroquois* Order shall remain in full force and effect.

By the Commission.

( S E A L )

Magalie R. Salas,
Secretary.

Docket No. CP98-150-006, et al.                              - 106 -

## Appendix A

Motions to Intervene in Docket No. CP98-150-006

Algonquin Gas Transmission, LLC
City of New York, New York
Columbia Gas Transmission Corporation
Consolidated Edison Company of New York, Inc.
El Paso Eastern Pipeline Group
KeySpan Delivery Companies[155]
Northern Tuxedo Residents' Association
Town of Tuxedo, New York
Woodstone Lakes Development, LLC


Motions to Intervene in Docket No. CP98-150-007

Central Hudson Gas & Electric Corporation
City of New York, New York
Consolidated Edison Company of New York, Inc.
KeySpan Delivery Companies
Northern Tuxedo Residents' Association
Town of Cortlandt, New York
Village of Croton-on-Hudson, New York
Columbia Gas Transmission Corporation


Motions to Intervene in Docket No. CP98-150-008

City of New York, New York
County of Westchester, New York
Town of Cortlandt, New York

---

[155] The KeySpan Delivery Companies consist of KeySpan Energy Delivery New York, KeySpan Energy Delivery Long Island, Boston Gas Company, Colonial Gas Company, EnergyNorth Natural Gas, Inc., and Essex Gas Company.

Docket No. CP98-150-006, et al.                                      - 107 -

Motions to Intervene in Docket No. CP98-151-003

Benson, Lawrence A.
El Paso Eastern Pipeline Group
Orange and Rockland Utilities, Inc.
Town of Tuxedo, New York
Woodstone Lakes Development, LLC

Motions to Intervene in Docket No. CP98-151-004

Orange and Rockland Utilities, Inc.
Proliance Energy, LLC

Motions to Intervene in Docket No. CP05-19-000

Baltimore Gas and Electric Company
Benson, Lawrence A.
Central Hudson Gas & Electric Corporation
Cities of Charlottesville and Richmond, Virginia (joint motion)
City of New York, New York
Darder, Charles
Dougherty, Christopher and Marianna
East Ohio Gas Company d/b/a Dominion East Ohio and Hope Gas, Inc. d/b/a Dominion
    Hope (joint motion)
Freier, Rolf
NiSource Distribution Companies[156]
Northern Tuxedo Residents' Association
Orange and Rockland Utilities, Inc.
Piedmont Natural Gas Company, Inc.
PSEG Energy Resources and Trade LLC
Rockland County Solid Waste Management Authority
Town of Tuxedo, New York
UGI Utilities, Inc.
Virginia Natural Gas, Inc.

---

[156] The NiSource Distribution Companies consist of Columbia Gas of Kentucky,
Inc., Columbia Gas of Maryland, Inc., Columbia Gas of Pennsylvania, Inc., and
Columbia Gas of Virginia, Inc.

Docket No. CP98-150-006, et al.                                    - 108 -

<u>Motions to Intervene in Docket No. CP06-76-000</u>

Brookfield, Connecticut Board of Education
Central Hudson Gas & Electric Corporation
Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities,
      Inc. (joint motion)
Empire State Pipeline
Iroquois Gas Transmission System
KeySpan Delivery Companies
Millennium Pipeline Company, L.L.C.
New England Local Distribution Companies
New Jersey Natural Gas Company
New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation
      (joint motion)
Pilot's Mall LLC
PSEG Energy Resources and Trade LLC
Town of Brookfield, Connecticut
Yankee Gas Services Company

<u>Motions to Intervene in Docket No. CP02-31-002</u>

Algonquin Gas Transmission, LLC
Central Hudson Gas & Electric Corporation
Consolidated Edison Company of New York, Inc.
Millennium Pipeline Company, L.L.C.
New Jersey Natural Gas Company
Niagara Mohawk Power Corporation d/b/a National Grid
State of Connecticut
Town of Brookfield, Connecticut

Docket No. CP98-150-006, et al.                                          - 109 -

## Appendix B

Untimely Motions to Intervene in Docket No. CP98-150-006

County of Westchester, New York
Empire State Pipeline
Hartwood Club, Inc.
Mirant NY-Gen, LLC
Town of Cortlandt, New York
Village of Croton-on-Hudson, New York

Untimely Motion to Intervene in Docket No. CP98-150-007

County of Westchester, New York
Hartwood Club, Inc.

Untimely Motion to Intervene in Docket No. CP98-151-003

Mirant NY-Gen, LLC

Untimely Motions to Intervene in Docket No. CP05-19-000

City of New York, New York
Murray, Steve
Northern Tuxedo Resident's Association
Town of Tuxedo, New York

Untimely Motion to Intervene in Docket No. CP06-76-000

Connecticut Siting Council

Docket No. CP98-150-006, et al.                                    - 110 -

## Appendix C

## Environmental Conditions for the NE-07 Project

1.      Millennium, EPI, Algonquin, and Iroquois shall follow the construction procedures and mitigation measures described in their applications and supplements (including responses to staff data requests) and as identified in the final supplemental EIS, unless modified by this order for their respective projects.  Millennium, EPI, Algonquin, and Iroquois must:

      a.      request any modification to these procedures, measures, or conditions in a filing with the Secretary;

      b.      justify each modification relative to site specific conditions;

      c.      explain how that modification provides an equal or greater level of environmental protection than the original measure; and

      d.      receive approval in writing from the OEP **before using that modification**.

2.      The Director of OEP has delegation authority to take whatever steps are necessary to insure the protection of all environmental resources during construction and operation of the projects.  This authority shall allow:

      a.      the modification of conditions of the order; and

      b.      the design and implementation of any additional measures deemed necessary (including stop-work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction and operation.

3.      **Prior to any construction**, Millennium, EPI, Algonquin, and Iroquois shall each file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors, and contractor personnel will be informed of the environmental inspector's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities for their respective projects.

Docket No. CP98-150-006, et al.                                    - 111 -

4.     The authorized facility locations shall be as shown in the final supplemental EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of any construction**, Millennium, EPI, Algonquin, and Iroquois shall each file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order for their respective projects. All requests for modifications of environmental conditions of the order or site specific clearances must be written and must reference locations designated on these alignment maps/sheets.

5.     Millennium, EPI, Algonquin, and Iroquois shall each file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary for their respective projects. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, and documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction** in or near that area.

This requirement does not apply to route variations required herein or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.     implementation of cultural resources mitigation measures;

b.     implementation of endangered, threatened, or special concern species mitigation measures;

c.     recommendations by state regulatory authorities; and

d.     agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

Docket No. CP98-150-006, et al.                                    - 112 -

6.     Within 60 days of the acceptance of this certificate and **before construction** begins, Millennium, EPI, Algonquin, and Iroquois shall each file an initial Implementation Plan with the Secretary for review and written approval by the Director of OEP, describing how they will implement the mitigation measures required by the order for their respective projects. Millennium, EPI, Algonquin, and Iroquois must file revisions to the plan as schedules change. The plan shall identify:

a.     how Millennium, EPI, Algonquin, and Iroquois will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

b.     the number of environmental inspectors assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

c.     company personnel, including environmental inspectors and contractors, who will receive copies of the appropriate material;

d.     what training and instructions Millennium, EPI, Algonquin, and Iroquois will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

e.     the company personnel (if known) and specific portion of Millennium's, EPI's, Algonquin's, and Iroquois' organization having responsibility for compliance;

f.     the procedures (including use of contract penalties) Millennium, EPI, Algonquin, and Iroquois will follow if noncompliance occurs; and

g.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

i.     the completion of all required surveys and reports;

ii.     the mitigation training of on-site personnel;

iii.     the start of construction; and

Docket No. CP98-150-006, et al.                                    - 113 -

   iv. the start and completion of restoration.

7. Millennium, EPI, Algonquin, and Iroquois shall each employ a team (*i.e.*, two or more or as may be established by the Director of OEP) of environmental inspectors per construction spread for their respective projects.  The environmental inspectors shall be:

  a. responsible for monitoring and ensuring compliance with all mitigative measures required by the order and other grants, permits, certificates, or other authorizing documents;

  b. responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (*see* condition 6 above) and any other authorizing document;

  c. empowered to order correction of acts that violate the environmental conditions of the order, and any other authorizing document;

  d. a full-time position, separate from all other activity inspectors;

  e. responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

  f. responsible for maintaining status reports.

8. Millennium, EPI, Algonquin, and Iroquois shall each file updated status reports prepared by the lead environmental inspector with the Secretary on a **weekly** basis **until** all construction related activities, including restoration and initial permanent seeding, are complete for their respective projects.  On request, these status reports will also be provided to other Federal and state agencies with permitting responsibilities.  Status reports shall include:

  a. the current construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

  b. a listing of all problems encountered and each instance of noncompliance observed by the environmental inspectors during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other Federal, state, or local agencies);

Docket No. CP98-150-006, et al.                                    - 114 -

    c.    corrective actions implemented in response to all instances of noncompliance, and its cost;

    d.    the effectiveness of all corrective actions implemented;

    e.    a description of any landowner/resident complaints which may relate to compliance with the requirements of the order and the measures taken to satisfy the concerns; and

    f.    copies of any correspondence received by Millennium, EPI, Algonquin, or Iroquois from other Federal, state, or local permitting agencies concerning instances of noncompliance, and the company's response.

9.    Millennium, EPI, Algonquin, and Iroquois each must receive written authorization from the Director of OEP **before commencing service** from their respective projects. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way is proceeding satisfactorily.

10.    **Within 30 days of placing the certificated facilities in service**, Millennium, EPI, Algonquin, and Iroquois shall each file an affirmative statement with the Secretary, certified by a senior company official for their respective projects:

    a.    that the facilities have been constructed and installed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the certificate conditions Millennium, EPI, Algonquin, and Iroquois has complied with or will comply with. This statement shall also identify any areas along the right-of-way where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

11.    Millennium, EPI, Algonquin, and Iroquois shall hire and fund a third-party contractor, to work under the direction of the Commission staff, for the sole purpose of monitoring compliance with the environmental conditions attached to the order for their respective projects, including all measures proposed by the companies. A draft monitoring program shall be developed by the companies and filed with the Commission for review and approval of the Director of OEP, along with a proposal from potential contractors that will be available to provide the monitoring and reporting services. The monitoring program shall include the following elements:

Docket No. CP98-150-006, et al.                                    - 115 -

    a.     the employment by the contractor of one to two full-time, on-site monitors per construction spread;

    b.     the employment by the contractor of a full-time compliance manager to direct and coordinate with the monitors, manage the reporting systems, and provide technical support to the Commission staff;

    c.     a systematic strategy for the review and approval by the contract compliance manager and monitors of variances to certain construction activities as may be required by each company based on site-specific field conditions;

    d.     the development of an Internet web site for the posting of daily or weekly inspection reports submitted by both the third party monitors and each company's environmental inspectors; and

    e.     a discussion of how the monitoring program could incorporate and/or be coordinated with the monitoring or reporting that may be required by other federal and state agencies.

12.    Millennium, EPI, Algonquin, and Iroquois shall each establish an environmental mitigation complaint resolution procedure that would be in place throughout construction and restoration of their respective projects. The procedure shall provide landowners and abutters with clear and simple directions for identifying and resolving their environmental mitigation problems or concerns during construction of the pipeline facilities and restoration of the right-of-way. **Prior to construction**, each company shall mail the complaint procedure to each landowner whose property would be crossed by the project and abutters whose properties are adjacent to a road or utility right-of-way that would be used for installation of the pipeline. The complaint resolution procedure must:

    a.     include a local contact (and telephone number) and each pipeline company's "hotline" contact (and toll-free telephone number) that the landowner or abutter shall first call with his/her concerns;

    b.     indicate how long it would take after complaints/inquiries are made for the pipeline company to respond;

    c.     indicate that the response would inform the caller how and when problems were or would be resolved; and

Docket No. CP98-150-006, et al.                                          - 116 -

    d.     instruct the landowner or abutter that if he or she is still not satisfied with the response from contacting the pipeline company's "hotline," the Commission's Enforcement Hotline may be contacted at (877) 303-4340.

In addition, each pipeline company shall include in its weekly status report a table that contains the following information for each problem or concern reported:

    a.     the identity of the caller and the date of the call;

    b.     the alignment sheet number, property identification number, and MP/survey station number of the property;

    c.     a description of the concern/problem; and

    d.     an explanation of how and when the problem was resolved, or why it has not been resolved.

13.    **Prior to construction**, Millennium, EPI, and Algonquin shall update the list of residences within 50 feet of the proposed facilities, and adopt the following measures to minimize the impact on residences within 50 feet of the construction rights-of-way for their respective projects:

    a.     avoid removal of trees and landscaping unless necessary to construct the pipeline or for the safe operation of the construction equipment;

    b.     restore all lawns, landscaping areas and driveways within the construction right of way area promptly after backfilling the trench; and

    c.     install and maintain construction fencing at the edge of the construction right-of-way for a distance of 100 feet on either side of the residence and at a minimum maintain this fencing throughout the open trench phases of the pipe installation.

14.    For any residence within 25 feet of the construction workspace, Millennium, EPI, and Algonquin shall file a site-specific plan with the Secretary for the review and written approval of the Director of OEP **before construction** for their respective projects. The plan shall include:

Docket No. CP98-150-006, et al.                                    - 117 -

a. a description of construction techniques to be used (such as reduced pipeline separation, centerline adjustment, use of stone-pipe or drag-section techniques, working over existing pipelines, pipeline crossover, bore, etc.), and include a dimensioned site plan that shows:

  i. the location of the residence in relation to the new pipeline and, where appropriate, the existing pipelines;

  ii. the edge of the construction workspace;

  iii. the edge of the new permanent right-of-way; and

  iv. other nearby residences, structures, roads, or waterbodies.

b. a description of how the company would ensure the trench is not excavated until the pipe is ready for installation and the trench is backfilled immediately after pipe installation; and

c. evidence of landowner concurrence if the construction workspace and fencing would be located within 10 feet of a residence.

15.   Millennium, EPI, Algonquin, and Iroquois shall file with the Secretary the location by MP of all drinking water wells and springs within 150 feet of the construction work area and include their distance and direction from the construction work areas for their respective projects, **before construction**.

16.   Millennium, EPI, and Algonquin shall include in their weekly construction progress reports any complaints concerning water supply yield or quality and how each was resolved. **Within 30 days of placing the facilities in service**, each company shall file a summary report identifying all potable water supply systems damaged by construction and how they were repaired for their respective projects.

17.   Millennium, EPI, Algonquin, and Iroquois shall **defer** implementation of any cultural resource treatment plan or measure (including archaeological data recovery), construction or use of all staging, storage, and temporary work areas or new or to-be-improved access roads for their respective projects **until**:

a. each company files with the Secretary all additional required cultural resource inventory, evaluation reports, and any necessary treatment plans and the SHPO comments; and

Docket No. CP98-150-006, et al.                                          - 118 -

> b.    the Director of OEP reviews and approves all reports and plans and notifies
> the companies in writing that treatment plans or measures may be
> implemented or construction may precede.

All material filed with the Commission containing location character and
ownership information about cultural resources must have the cover and any relevant
pages therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED
INFORMATION — DO NOT RELEASE."**

## Millennium's Conditions

18.    Millennium shall use the proposed NYSEG Chemung route variation (MP 198.0 to
MP 203.6), the NYSEG Tioga-Broome route variation (MP 232.2 to MP 245.0), and the
NYSEG Delaware route variation (MP 284.4 to MP 284.9) rather than the segment of the
original, approved Millennium project route between these MPs.

19.    Millennium shall acquire from Columbia and continue to use the approximately
7.1-mile-long segment of 24-inch diameter Line A-5 pipeline between MPs 340.5 and
347.7, rather than replace this segment with new 30-inch diameter pipeline.

20.    Millennium shall use the proposed Warwick Isle route variation (MP 350.8 to
MP 351.6), rather than the segment of the original, approved Millennium project route
between these mileposts.

21.    Millennium shall incorporate the Sterling Forest State Park/Laurel Ridge
alternative between (MPs 367.8 and 368.5). Millennium shall consult with the FWS to
determine the need for any additional surveys for federally-listed threatened or
endangered species and consult with the SHPO to determine the need for additional
cultural resource surveys along the Sterling Forest State Park/Laurel Ridge alternative.
Millennium shall file with the Secretary, for written review and approval by the Director
of OEP, revised construction alignment sheets that show the modified route and
workspaces, **prior to construction** in this area.

22.    Millennium shall incorporate the Ramapo River HDD variation (MPs 369.4 to
370.3). Millennium shall consult with the FWS to determine the need for any additional
surveys for federally-listed threatened or endangered species and consult with the SHPO
to determine the need for additional cultural resource surveys along the Ramapo River
HDD variation. Millennium shall file with the Secretary, for written review and approval
by the Director of OEP, revised construction alignment sheets that show the modified
route and workspaces, **prior to construction** in this area.

Docket No. CP98-150-006, et al.                                                    - 119 -

23.     Millennium shall develop a site-specific plan for construction and restoration across the Supa property (approximate MP 242.0). In developing the plan, Millennium shall consider alternative construction methods, such as the stove-pipe method, and limited access across the Supa property along the construction right-of-way after construction. Millennium shall file the site-specific plan with the Secretary for review and written approval of the Director of OEP **prior to construction** in this area.

24.     Millennium shall file with the Secretary a plan for the crossing of any waterbody where the HDD is unsuccessful. This shall be a site-specific plan that includes scaled drawings identifying all areas that would be disturbed by construction. Millennium shall file this plan concurrent with its application to the COE and NYSDEC for a permit to construct using this plan. The Director of OEP must review and approve this plan in writing before construction of the crossing using this plan.

25.     Millennium shall file with the Secretary **prior to construction** a list of the waterbodies where equipment bridges would be installed to facilitate tree clearing along the construction right of way between October 1 and March 30, to avoid impacting the federally endangered Indian bat, and provide documentation of approval of this activity from the NYSDEC.

26.     Millennium shall provide the NPS with an initial waterbody crossing schedule for Delaware River tributary crossings and provide updates to that schedule as may be needed in a manner consistent with section II.A.2 of our Procedures.

27.     Millennium shall conduct tree clearing during the period of October 1 to March 30, to minimize adverse affects on the Indiana bat in the areas of known bat activity, between MPs 346 and 363. Future maintenance activities that involve tree removal, pruning, or similar activities, shall be scheduled to occur between October 1 and March 30 to avoid disturbing roosting bats. Millennium shall employ the services of a qualified bat scientist to investigate trees and/or conduct other surveys as may be recommended by the FWS for the presence of Indiana bats if removal of a limited number of trees is necessary between April 1 and September 30, to avoid a take of bats.

28.     Millennium shall install turtle exclusion fencing during the bog turtle window of activity (April 15 to October 31), where Wetland W611 borders the project construction area. Further, Millennium shall employ a bog turtle monitor to be on hand when construction coincides with the bog turtle window of activity, to conduct a daily pre-construction survey of the Wetland W611 project site and to provide daily monitoring and relocation of bog turtles to suitable habitat outside the Wetland W611 construction area when necessary.

Docket No. CP98-150-006, et al.                                          - 120 -

29.    If blasting is required in designated bald eagle activity areas when bald eagles are present, Millennium shall develop in consultation with the NYSDEC and FWS a bald eagle activity area construction plan that identifies the MP locations where blasting would occur within bald eagle activity areas and a schedule of when blasting would occur. The bald eagle activity area construction plan and all associated consultation documents shall be filed with the Secretary **before construction**.

30.    Millennium shall consult with the FWS and NYSDEC at least one month before the start of construction to determine if any additional bald eagle nests have been found in the vicinity of the project area. Documentation of the results of this consultation shall be filed with the Secretary **before construction**.

31.    Millennium shall file a post-construction noise survey with the Secretary **no later than 60 days** after placing its new compressor station in Corning, New York, in service. If the noise attributable to the operation of both Millennium's compressor station and the adjacent existing Columbia Corning compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Millennium shall install additional noise controls to meet the level **within one year** of the in-service date. Millennium shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later 60 days** after it installs the additional noise controls.

## EPI's Conditions

32.    EPI shall file with the Secretary, **prior to construction across Ganargua Creek**, a site-specific plan for completing the crossing of the creek at CMP 3.6 and wetland 80B for review and written approval of the Director of OEP. The plan shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces including pipe lay down areas. The Ganargua Creek crossing plan shall also be provided to the COE and NYSDEC for their review. Any comments EPI receives from these agencies shall be filed with the Secretary.

33.    EPI shall file with the Secretary site specific plans for completing the crossings of Canandaigua outlet (CMP 15.1) and Keuka Lake outlet (CMP 40.6) by HDD, prior to construction of the waterbody crossings, for review and written approval by the Director of OEP. The plans shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces including pipe lay down areas.

34.    EPI shall file with the Secretary, **prior to construction of the waterbody crossing**, site specific plans for completing the crossing of Shequaga Creek (CMP 67.0) by a bored crossing, for review and written approval of the Director of OEP. The plan

Docket No. CP98-150-006, et al.                                    - 121 -

shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces.

35.    EPI shall file with the Secretary for review and written approval of the Director of OEP, site-specific restoration plans, including scaled drawings, for the crossing of Glen Creek (CMP 62.9) and Townsend Creek (CMP 63.8) that describe and show the areas that would be affected by restoration and how these areas would be restored, **prior to construction of the waterbody crossings**. Also, EPI shall provide any correspondence concerning this issue with the NYSDEC and the COE.

36.    EPI shall file with the Secretary, **prior to construction of the Oakfield compressor station,** a final site-specific plan for the access road to the proposed compressor station, that identifies how it would cross the unnamed waterbody on a permanent and temporary basis and identifies all of the temporarily and permanently affected areas, for review and written approval of the Director of OEP.

37.    EPI shall consult with the COE to develop a wetland mitigation plan, consistent with that prepared for the original Millennium project, to compensate for impacts to forested wetlands.  The plan shall include on-site restoration of all affected wetlands, as well as off-site forested wetland acquisition, at a minimum ratio of 2:1, and forested wetland creation, at a minimum ratio of 1:1, for the total acreage of forested wetlands that would be converted to non-forested wetland communities, and shall address restoration of temporary workspaces.  EPI shall file the final wetland mitigation plan with the Secretary as soon as it is available.

38.    EPI shall make all reasonable efforts to ensure that its predicted noise levels from the Oakfield compressor station are not exceeded at nearby NSAs, and file a noise survey with the Secretary **no later than 60 days** after placing the new compressor station in service.  However, if the noise attributable to the operation of the compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, EPI shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date.  EPI shall confirm compliance with the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

39.    EPI shall file with the Secretary for review and written approval of the Director of OEP site specific plans identifying how noise would be reduced during horizontal directional drilling at Canandaigua outlet and Keuka Lake outlet **prior to construction of the crossings**.  The plan shall include projected daytime and nighttime noise levels at nearby residences and mitigation measures that would be used to minimize noise at these residences.

Docket No. CP98-150-006, et al.                                  - 122 -

**Algonquin's Conditions**

40.     Algonquin shall use Site F for construction of the Oxford compressor station in Oxford, Connecticut.

41.     Algonquin shall file with the Secretary for review and written approval by the Director of OEP, a request for site specific variances to section V.B.2 of our plan. The request shall include milepost location(s), spacing for the permanent slope breakers, and reasons for the requested variance at the identified location(s).

42.     Algonquin shall expand its SPCC Plan to specifically include a requirement that all construction equipment be inspected daily for leaks.

43.     Algonquin may use extra workspaces within 50 feet of these resources:  Mahwah River, AMP 0.54; Intermittent Stream (Wetland 02), AMP 0.76; Intermittent Stream, AMP 1.43; Intermittent Stream, AMP 2.35; Intermittent Stream, AMP 2.95; Intermittent Stream (Wetland 03), AMP 3.26; Intermittent Stream (Wetland 04), AMP 3.29; Intermittent Stream, AMP 4.12; Intermittent Stream, AMP 4.66; and Intermittent Stream, AMP 4.87.  However, **prior to the use of these extra workspaces**, Algonquin shall file with the Secretary for review and written approval by the Director of OEP, site specific plans for each of the identified locations that show the configuration and dimensions of the extra workspaces relative to the waterbody or wetland, the setback from these resources, the proposed pipeline construction right-of-way, and all existing or proposed pipeline facilities.  The site specific plans shall be included with the pipeline construction alignment sheets.

44.     Algonquin shall conduct tree clearing during the period of October 1 to March 30, to minimize adverse affects on the Indiana bat pending comment by the FWS.  Future maintenance activities that involve tree removal, pruning, or similar activities, shall be scheduled to occur between October 1 and March 30 to avoid disturbing roosting bats.

45.     Algonquin may use an additional 25 feet of temporary extra workspace adjacent to the existing Algonquin right of way at these locations:  Wetland 01, AMP 0.29 to AMP 0.60; Wetland 02, AMP 0.73 to AMP 0.82; Wetland 03, AMP 3.25 to AMP 3.27; and Wetland 04, AMP 3.28 to AMP 3.31.  However, **prior to the use of these extra workspaces**, Algonquin shall file with the Secretary site specific plans for each location showing all workspaces and the existing and proposed pipeline facilities, for review and written approval by the Director of OEP.  Algonquin shall also file with the Secretary concurrence from the COE about the use of these areas.

Docket No. CP98-150-006, et al.                                                    - 123 -

46.     Algonquin shall consult with the COE to develop a wetland mitigation plan, consistent with that prepared for the original Millennium project, to compensate for impacts to forested wetlands.  The plan shall include on-site restoration of affected wetlands, off-site forested wetland acquisition, at a minimum ratio of 2:1, and forested wetland creation, at a minimum ratio of 1:1, for all forested wetlands that would be converted to non-forested wetland communities and shall also address restoration of temporary workspaces.  Algonquin shall file the final wetland mitigation plan with the Secretary as soon as it is available.

47.     Algonquin shall file with the Secretary **prior to construction**, information about any additional pipe/contractor yard(s) it would use to construct its project including topographic maps showing the pipe/contractor yard locations and quantified information about impacts on land use, residences, wetlands, wildlife, and vegetation for review and written approval of the Director of OEP.

48.     Algonquin shall file with the Secretary all mitigation plans for construction of the pipeline and restoration of the construction right-of-way developed with the PIPC for construction in Harriman State Park and with the Rockland County Division of Environmental Resources for construction in Kakiat County Park **before construction in the parks** for review and written approval of the Director of OEP.

49.     Algonquin shall file a post-construction noise survey with the Secretary **no later than 60 days** after placing the modified Hanover, Stony Point, and Southeast compressor stations in service.  If the noise attributable to the operation of any of these compressor stations at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Algonquin shall install additional noise controls to meet the level **within one year** of the in-service date.  Algonquin shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later 60 days** after it installs the additional noise controls.

50.     Algonquin shall make all reasonable efforts to assure its predicted noise levels from the Oxford compressor station are not exceeded at nearby NSAs, and file a noise survey with the Secretary, the CSC, and the Towns of Oxford and Middlebury **no later than 60 days** after placing the new compressor station in service.  However, if the noise attributable to the operation of the compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Algonquin shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date.  Algonquin shall confirm compliance with the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

Docket No. CP98-150-006, et al.                                      - 124 -

**Iroquois' Conditions**

51.    Iroquois shall develop in consultation with the Connecticut Department of Environmental Protection, a plan for handling waste materials that may be encountered during construction of any facilities at the Brookfield compressor station site on High Meadow Road in Brookfield, Connecticut.  This plan should be filed with the Secretary for review and written approval by the Director of OEP, **prior to construction** of the compressor station.

52.    Iroquois shall make all reasonable efforts to ensure that its predicted noise levels from the Brookfield compressor station are not exceeded at nearby NSAs, and file a noise survey with the Secretary and the CSC **no later than 60 days** after placing the new compressor station in-service.  However, if the noise attributable to the operation of the compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Iroquois shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date.  Iroquois shall confirm compliance with the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

53.    Before construction and once the final site layout, building design and equipment selection are determined, Iroquois shall file with the Secretary a comprehensive noise analysis showing that the noise levels at nearby NSAs, such as schools (specifically the Whisconier Middle School), hospitals, and residences would not exceed an Ldn of 55 dBA, due to the operation of the Brookfield compressor station at full load.

54.    Iroquois shall file a post-construction noise survey with the Secretary **no later than 60 days** after placing the modified Dover compressor station in service with the proposed additional gas coolers.  If the noise attributable to the operation of the modified compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Iroquois shall install additional noise controls to meet the level **within one year** of the in-service date.  Iroquois shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later 60 days** after it installs the additional noise controls.

**Additional Conditions**

55.    Prior to construction, Millennium shall file with the Secretary, for review and written approval of the Director of OEP, a report about the diesel fuel observed on the Supa property in test boring one on January 12, 2006.  The report shall provide information about potential sources of diesel fuel and shall address whether further

Docket No. CP98-150-006, et al.                                          - 125 -

evidence of diesel fuel was observed during any subsequent instances of monitoring the
test borings. The report shall also address the issue of the need for clean up and a plan
for clean up.

56.    Prior to construction, Algonquin shall file with the Secretary, for review and
written approval of the Director of OEP, the final site-specific plan for crossing the
Mahwah River developed in consultation with the COE, NYSDEC, and the affected
landowner(s).