UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**MILLENNIUM PIPELINE COMPANY, L.L.C.,**

*Plaintiff,*

-vs-

**CERTAIN PERMANENT AND TEMPORARY
EASEMENTS IN (No Number) EAST SIDE OF
STATE HIGHWAY 94 & 17A, S.B.L. No. 31-2-64.32
AND (No Number) WEST SIDE OF STATE
HIGHWAY 94 & 17A, S.B.L. No. 31-2-66.2, TOWN
OF WARWICK, COUNTY OF ORANGE, NEW
YORK, John W. Sanford, III, John Doe, et al., and
Unknown Owners,**

*Defendants.*

**REPLY AFFIDAVIT OF
MARK D. LANSING IN SUPPORT
OF PLAINTIFF'S MOTION FOR
A PRELIMINARY INJUNCTION**

Civil Action No.
07 CV 7646

Hon. Kenneth M. Karas

---

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | ) SS: |
| **COUNTY OF ALBANY** | ) |

MARK D. LANSING, being duly sworn, deposes and says:

1.    I am an attorney duly licensed to practice law before the courts of the State of New York and the United States District Court for the Southern District of New York. I am a member of the law firm of Hiscock & Barclay, LLP, attorneys for Plaintiff Millennium Pipeline Company, L.L.C. ("Millennium"). I am fully familiar with the facts and circumstances of this action and the statements made herein. The bases for all statements, including those made upon information and belief, are my review of certain of Millennium's books and records, and my discussions with representatives of Millennium.

2. I submit this Affidavit in reply to the papers submitted by Defendant John W. Sanford, III ("Mr. Sanford") and in further support of Millennium's motion for an injunction, pursuant to Federal Rules of Civil Procedure ("FRCP") 65(a), permitting Millennium to immediately enter upon the real property owned by Mr. Sanford, known as (no number) East Side of State Highway 94 & 17A, Town of Warwick, County of Orange, New York, S.B.L. No. 31-2-64.32, Millennium Tract Nos 110263 and 110263.01 and the property known as (no number) West Side of State Highway 94 &17A, Town of Warwick, County of Orange, New York, S.B.L. No. 31-2-66.2, Millennium Tract Nos. 110265 and 110265.02 (collectively, the "Sanford Property"), for the purpose of commencing work associated with the construction of a natural gas pipeline, and thereby, to effectuate a public project approved by the Federal Energy Regulatory Commission ("FERC") (the "Project").

A.    **The Allegations by Mr. Sanford and Context of Case.**

3. Mr. Sanford's opposition papers can be reduced to the following allegations:

   a.    Potential destruction of an electric fence (with potential loss of cattle);
   b.    Potential loss of crop to feed livestock;
   c.    A Real Estate Broker's estimate of $500,000 in "damages";
   d.    Rejection that the purpose for coming onto the property is for clearing, or
   e.    That the case is premature.

As demonstrated more fully below, each of these allegations is lacking in factual support (or reality) and are contrary to applicable law.

4. To set Mr. Sanford's opposition papers in their proper context, the Project involves Millennium's construction of a 182 mile pipeline through 1,478+/- properties in eight counties. This work must be coordinated and effectuated to maintain uninterrupted gas service to the thousands of customers currently being serviced by Columbia Gas Transmission Corporation's ("Columbia") existing Line A-5 pipeline, which the Millennium pipeline will

replace. Although all work associated with the pipeline's construction, including re-seeding and final restoration of those 1,478 parcels (following laying the pipe) must be completed by no later than December 31, 2009 (less than 2.5 years from now; see FERC Order issued on December 21, 2006 ("FERC Order")), actual laying of the pipeline, itself, must be completed no later than November 1, 2008, to ensure uninterrupted supply for natural gas of the 2008-09 winter season, and to meet Millennium's contractual requirements.

5.     In consideration of the massive size of the Project and the requirement that all pipe must be laid by November 1, 2008, by definition, any inability to access properties according to Millennium's prerogative and schedule, to commence and complete pre-construction and/or construction activities, will result in irreparable harm to Millennium and the public at large. *See* September 6, 2007 Memorandum, Point II(B); *see also* Millennium's Reply Memorandum, dated September 21, 2007, Point A.

6.     Moreover, Millennium (via Columbia) already possesses a sixteen to nineteen foot wide permanent easement in the Sanford Property. In fact, when he took title to his Property, Mr. Sanford knew the existing pipeline burdened the Property that Millennium now seeks to replace.

7.     With respect to the Sanford Property, Millennium seeks the following:

   (a) Temporary easements that comprise a mere three acres in total, consisting of a **temporary** access road, **temporary** construction easements and limited **temporary** work space (all of which will cease to exist once construction is complete).
   (b) Permanent easements of less than **three acres** that merely widen the existing easement and provide for a short new easement (where the proposed pipeline diverges slightly from the existing pipeline).
   (c) A permanent right of way of **less than a quarter of an acre** to improve in existing access road.

8.      Millennium must have immediate possession of the Sanford Property no later than October 1, 2007 to properly sequence tree clearing, as Millennium intends to commence actual construction at the property in 2008. September 6, 2007 Lansing Affidavit, ¶20. Along these lines, approximately seventeen miles of clearing will take place between October 1, 2007 and March 31, 2008 to comply with the FERC's Order to minimize the adverse affects to the Indiana bat. In this regard, Millennium must sequence and effectuate the clearing of about 220 parcels in that limited five month period, which also encapsulates winter.

**B.      Construction of a Pipeline Project is Based on Sequencing and Limited by Several Factors. In a Project of this Size, Mr. Sanford's Claims Regarding the Timing of Millennium's Possession is Erroneous.**

9.      Mr. Sanford argues that Millennium's need to enter the Property is not imminent, claiming that Millennium does not need access until March 31, 2008. Such allegations fail to understand or acknowledge the complexity and extent of the Project's construction. Mr. Sanford improperly requests the Court to focus solely on his property, to the exclusion of the entire pipeline.

10.      The sequencing of pipeline construction and maintenance of that sequencing is essential for timely and efficient construction of the pipeline and implementation of the FERC determined public need.

11.      To sequence construction, there is a systematic process for installing pipelines. One construction activity follows another in an assembly line type process. The typical sequence commences with obtaining the necessary permits and land rights. That is followed by the construction work area on the right-of-way being staked by surveyors. Once the limits of the

construction area have been identified, the clearing operations begin.[1] Following clearing, the right-of-way is graded and the pipe ditch dug. Pipe is strung along the edge of the ditch and welded. Once the pipe is welded into sections, it is lowered into the ditch. The ditch is then backfilled and restoration begins. The pipeline is tested, typically using water to a pressure higher than it will be subjected to when operating. Final restoration work follows once the pipeline has been successfully tested. The entire pipeline must be fully installed, re-seeded and restored no later than December 2009, a heavy but doable task, provided Millennium is allowed to sequence the construction process unimpeded, which includes immediate possession of the Sanford Property.

12.    By necessity, then, Millennium seeks to exercise its temporary easement rights at every property (not just the Sanford Property) for several years until the completion of the Project's construction. As it will cross almost 1,500 parcels in less than 2.5 years, the opposition Millennium faces from Sanford, and other property owners (including security hearings that Millennium anticipates will be required), necessitate the commencement of this and other cases. One property owner, like Mr. Sanford, cannot be permitted to "hold up" the entire process or make it less efficient by denying access to his land. Such denial could adversely affect the entire Project. With all due respect to Mr. Sanford, one property owner cannot be permitted to stand in the way of or otherwise adversely impact the Project.

13.    As there are a myriad of issues and factors that must be accounted for in this 182 mile pipeline construction project, that crosses almost 1,500 parcels, the proposed schedules

---

[1] Since the total length of the proposed Millennium pipeline is 182 miles, clearing must be performed by several clearing crews. Some portions of the Project have already been cleared in anticipation of installing about twelve miles of pipe in 2007.

applicable to the Sanford Property cannot be changed. Again, 220 parcels must be cleared
between October 1, 2007 and March 31, 2008, not just Mr. Sanford's Property.

### C. Here, In Addition to Normal Construction Sequencing, Millennium is Further Limited by Market, Environmental and Other Governmental Limitations.

14.    The construction time period for the Project is further limited by several factors,
two of the biggest being: (i) maintaining gas supplies to existing markets as the pipeline is
constructed and, (ii) complying with environmental construction timing windows that have been
imposed on the Project.

15.    As to the first factor, the Millennium pipeline is, for the most part, using an
existing and active ten inch diameter pipeline right-of-way to construct its facilities.    The
pipeline being replaced presently serves existing local distribution companies (e.g., Orange and
Rockland Utilities, Inc.).[2]  To maintain gas service, only one section of pipe can be taken out at a
time.  The time period for replacing the section of the existing pipeline is limited to only late
spring, summer, and fall, when the demand for natural gas is lowest.

16.    Thus, Millennium's construction schedule necessitates that the entire pipeline
Project be in-service by November 1, 2008, to meet the large winter customer demands for
natural gas. Millennium's customers include Consolidated Edison, Keyspan, Columbia Gas, and
Central Hudson, who, in turn, distribute the natural gas to residences, businesses and
governmental facilities.

17.    In addition to these market restrictions, Millennium is also confronted with
environmental timing windows that were imposed to protect sensitive land features or

---

[2] The ten-inch pipeline is being replaced by thirty-inch pipeline, not a thirty-six inch pipe as alleged by Mr. Sanford.

endangered species.[3]  Millennium must comply with permit conditions and requirements from several agencies including FERC, US Army Corps of Engineers, US. Fish and Wildlife, New York State Historic Preservation Office, and New York Department of Environmental Conservation.  All the conditions and requirements imposed on the Project by these agencies are necessarily factored into the construction schedule and construction sequence of the entire pipeline Project, not merely the Sanford Property.

**D.     Claim of No Trees or Bats is Erroneous and, More Importantly, Irrelevant.**

18.     Mr. Sanford alleges that the Sanford Property is, in part, devoid of trees and is not part of the Indiana bat habitat. For purposes of the FERC Order that governs the Project's constructions, Mr. Sanford is incorrect. The Sanford Property is located near milepost 359, which is within the area affected by the FERC's condition 27.  See Exhibit 1, attached to Complaint, p. 119 (within "MPs 346 and 363"). Furthermore, there are trees on the Sanford Property that require clearing for the Project.  For example, trees exist where the Sanford Property is bisected by State Highway 94 & 17A.[4]  See Exhibit 1, attached hereto.

19.     Regardless of the presence of trees or bats, Millennium must have immediate possession to the easements to ensure that the Sanford Property is cleared and ready for construction in 2008, in its proper sequencing.  Over 220 parcels require clearing by March 31, 2008 to comply with the FERC Order and to effectuate proper sequencing of construction in 2008.

---

[3] Across the entire pipeline Project, Millennium must comply with New York Department of Environmental Conservation's requirement to minimize construction interference with fish migration and spawning.  As a result, Millennium is limited to performing in-stream construction in coldwater fisheries between June 1 to September 30, and coolwater and warmwater fisheries considered significant by the state, between June 1 and November 30, unless other timing windows are permitted by federal or state agencies.

[4] More fundamentally, if Mr. Sanford is correct, then clearing should neither take long, impact crops or result in fencing being removed.

E.    **Mr. Sanford's Claim Regarding Livestock and Fencing are Lacking in Merit.**

20.    Mr. Sanford also alleges that his fencing and livestock will be harmed, somehow. While these issues relate to compensation, and thereby, as a matter of law, do not constitute irreparable harm, they are also lacking factual merit. Mr. Sanford provides no admissible evidence that either the fence or livestock will be damaged or lost.

21.    Millennium previously assured and offered to work with Mr. Sanford to minimize damage to either fencing or livestock during both pre-construction and construction activities, including tree-clearing. In fact, Millennium assured Mr. Sanford that it would undertake efforts to protect his fencing and livestock, as such efforts are a normal part of pipeline construction. Such normal construction efforts also include provision for temporary and alternative fencing arrangements.

22.    Millennium made those assurances as it follows the environmental construction standards, which require that when it is necessary to remove fences, adequate temporary fences or gates are installed immediately. See Exhibit 2, attached hereto. In addition, based on consultation with the landowner, temporary fencing will be installed along and/or across the construction area as necessary to protect livestock from construction activities. Alternative pasturing/feeding arrangements may also be made. Once construction is complete, permanent fence repairs are made. Millennium representatives have advised that this was made known to Mr. Sanford.[5]

23.    As he was advised of these intended efforts, Mr. Sanford's concerns are unwarranted.

---

[5]Millennium representatives met with Mr. Sanford on several occasions to work out those details and to attempt to settle the compensation issues. Without disclosing the settlement amounts, offered Mr. Sanford payment well in excess of Millennium's damage values. During those meetings, Mr. Sanford never advised Millennium representatives they should speak directly with Mr. Sanford's counsel, or to cease contact with Mr. Sanford. Further, no effort was made to intimidate Mr. Sanford.

**F. Mr. Sanford has Failed to Demonstrate Damages or the Need for Security for Millennium's Immediate Possession.**

24.    Finally, the extent to which Mr. Sanford is impacted by the Project is wholly irrelevant.  By the United States Constitution (Fifth Amendment), Mr. Sanford is required to be fully protected or compensated.  For purposes of immediate possession, that protection can take the form of security ordered by this Court. Ultimately, the protection results from the compensation that this Court orders.  Accordingly, Mr. Sanford has no grounds to object to the Project, its timing or Millennium's present request for immediate possession.

25.    With respect to issues of negotiation and valuation, Millennium previously valued the damages to the Sanford Property in the amount of $71,000, based on use of the Sanford Property as farming property for over four generations.

26.    The appraisal submitted by Mr. Sanford is deficient, as it fails to value the Sanford Property at its established highest and best use.  More fundamentally, and with all due respect to Ms. White, the real estate broker, she is not an appraiser.

27.    The determination of highest and best use is critical to an appraiser's conclusion of value in an eminent domain proceeding.  Highest and best use is that reasonably probable and legally alternative use which is physically possible, appropriately supported, financially feasible and which results in the highest present land value. The property owner is entitled to be compensated according to the market value of the property at its highest and best use. *Matter of NYC Franklin Record Ctr., Inc.*, 59 N.Y.2d 57, 61, 463 N.Y.S.2d 168, 169 (1983).  It is the claimant's burden of proof to establish highest and best use which is grounded in reality, particularly where the existing use of the property is other than its highest and best use. As the Court of Appeals has stated:

> While it is not essential to demonstrate either that the property had been used as its projected highest and best use or that there had been an <u>ante</u> <u>litem</u> plan for such use..., it is, of course, necessary to show

> that there is a reasonable probability that its asserted use could or would have been made **within the reasonably near future**... and a "use which is no more than a speculative or hypothetical arrangement in the mind of the claimant may not be accepted as the basis for an award". (Citations omitted).

*Matter of the City of New York (Broadway Cary Corp.)*, 34 N.Y.2d 535, 354 N.Y.S.2d 100, 101

(1974). Where the record evidence of plans for future improvements to the property are

speculative, such evidence is insufficient to merit award for future damages. *See Southern*

*Natural Gas Co. v. Land, Cullman Co.*, 197 F3d 1368 (11th Cir. 1999).

28.     Millennium has checked the records of the Town of Warwick. It found no application by Mr. Sanford for or receipt of subdivision approval. Mr. Sanford has not provided any proof of such activities in his opposition papers.

29.     To the contrary, Mr. Sanford states that he is in the process of acquiring additional head of cattle to maintain his family's multi-generational farming operations. He recently spent $10,000 for an electric fence, that he assiduously claims cannot be violated for the protection of his livestock. Simply, Ms. White's speculation on subdivision development of Mr. Sanford's Property is wholly deficient in proof.

**[Intentionally left blank.]**

**WHEREFORE,** deponent respectfully prays for this Court to grant an Order authorizing Millennium to enter upon the Sanford Property immediately upon the Court's determination of the amount of security that Millennium will be required to post in favor of Mr. Sanford; that Mr. Sanford, his employees, agents, contractors and all other representatives be enjoined from interfering with such entry; and granting to Millennium such other and further relief as the Court deems fair and proper.

_____
**MARK D. LANSING**
Bar Roll No. MDL1947

Subscribed and sworn to before me
this 24th day of September, 2007.

_____
Notary Public

SHARON R. MADDALLA
Notary Public, State of New York
No. 01MA6117905
Qualified in Rensselaer County
Commission Expires Nov. 1, 2008

# EXHIBIT 1











**EXHIBIT 2**

*Environmental Construction Standards*

butt will be cut into pole lengths or as specified in the easement agreement.

### 2.   Brush

All cleared brush will be disposed of by one of the following methods:

- Brush may be piled just off the CWA but not within 50 feet of streams, floodplains, or wetlands. Equipment stacking the brush will not leave the CWA. Brush piles will be constructed a maximum of 12 feet wide and compacted to approximately 4 feet high, with a minimum of every 200 feet to permit wildlife travel. The landowner will be consulted to determine acceptable brush pile locations along the CWA. Brush may be burned where permitted by law provided necessary burning permits are obtained. Fires will be of reasonable size, not located in environmentally sensitive areas, and patrolled so that they will not spread off the CWA.

- The brush may be chipped. Chips will be given away, buried, or thinly spread (less than 2 inches thick) over the CWA or piled off the CWA per landowner request, except in *agricultural lands* or within 50 feet of streams, floodplains, or wetlands. Chipping will be limited to those areas specified in the *easement agreement*. During *restoration*, soil will be augmented by the addition of 12 to 15 pounds of nitrogen (at least 50% slow release) per ton of chips to aid revegetation.

### 3.   Fence Crossings

Where it is necessary to remove fences, adequate temporary fences or gates, as illustrated in Figure 3, will be installed *immediately*. Such temporary fences or gates will be kept closed, except when necessary for construction purposes. Based on consultation with the landowner, temporary fencing will be installed along and/or across the CWA as necessary to protect livestock from active pipeline construction and open trenches. In addition, alternative pasturing/feeding arrangements may also be made.

Once construction is completed, permanent fence repairs will be completed. All fences that have been cut or removed will be permanently repaired or replaced during restoration to match the original type of the fence as much as possible. Where there is any doubt as to the usability of old fence material, new material will be used in making repairs. Fence posts will be installed to a depth that will prevent frost heave (normally 24- to 36-inches).

### D.   GRADING

Grading is necessary to provide a smooth and even surface for safe and efficient operation of construction equipment. Grading will be the minimum amount necessary and includes prompt installation of erosion control devices, such as interceptor diversions, *sediment filter devices*, and equipment crossings at streams to minimize soil loss and subsequent sedimentation.

### 1.   Tree Stump and Rock Removal/Disposal

Tree stumps and large rocks will be cut, graded, or removed as necessary to permit construction and to provide adequate clearance for mechanical

3